<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI
                  CASE NO. 15-CR-20106-KMM
 3      ──────────────────────────────────────────────

 4    UNITED STATES OF AMERICA,
                         Plaintiff
 5             vs.                            July 10, 2015

 6    PATRICK KILLEN, JR,
                         Defendant.
 7
        ──────────────────────────────────────────────
 8            EXAMINATION OF DEFENDANT AT TRIAL

 9        BEFORE THE HONORABLE K. MICHAEL MOORE,

10         UNITED STATES DISTRICT COURT JUDGE

11      ──────────────────────────────────────────────
                     A P P E A R A N C E S
12
      FOR THE PLAINTIFF:     ROBERT J. EMERY, AUSA
13    UNITED STATES OF       BENJAMIN J. WIDLANSKI, AUSA
      AMERICA                U.S. Attorney's Office
14                           99 NE 4th Street
                             Miami, FL 33132
15                           (305) 961-9421
                             Robert.emery@usdoj.gov
16

17    FOR THE DEFENDANT:     FRED A. SCHWARTZ, ESQ
      PATRICK KILLEN, JR     Kopelowitz Ostrow Ferguson Weiselberg
18                           Keechl
                             200 E. Palmetto Park Road, Suite 103
19                           Boca Raton, FL 33432
                             (561) 910-3070
20                           Schwartz@kolawyers.com

21
      REPORTED BY:           GIZELLA BAAN-PROULX, RPR, FCRR
22                           United States Court Reporter
                             400 North Miami Avenue, Suite 8S32
23                           Miami  FL  33128
                             (305) 523-5294
24                           gizella_baan-proulx@flsd.uscourts.gov

25
</pre>

GOVERNMENT
EXHIBIT

CASE 15-CR-
NO. 20106-KMM(S)

EXHIBIT
NO. 1-5

P R O C E E D I N G S

1

2        *(The following proceedings were held in open court.)*

3     *      *      *      *      *      *      *      *      *      *      *

4        *(Thereupon, proceedings were held but not transcribed.)*

5     *      *      *      *      *      *      *      *      *      *      *

6     Thereupon,

7                      **PATRICK KILLEN, JUNIOR,**

8     having been duly sworn by the courtroom deputy, testified as

9     follows:

07:11  10               **THE DEFENDANT:**  Yes.

11               **THE COURTROOM DEPUTY:**  Thank you.  Please be

12    seated, and would you please state your full name for the

13    record.

14               **THE WITNESS:**  Okay.  Patrick Killen, Junior.

07:11  15               **THE COURTROOM DEPUTY:**  Thank you.

16               **THE WITNESS:**  Thank you.

17

18                      *DIRECT EXAMINATION*

19    BY MR. SCHWARTZ:

07:11  20    Q.  And Patrick, you don't have to lean too close to the

21    microphone.  It should pick you up.  If it's not, either

22    myself or the court reporter will let you know.

23    A.  **Okay.**

24    Q.  Patrick, how old are you?

07:11  25    A.  **I am currently 22 years old.**

```
 1   people; my family life; and just about everything.  I always

 2   questioned, but I could never, you know, go through with

 3   anything.

 4   Q.   So did you want naked pictures of boys for sexual

 5   gratification?

 6   A.   I would say that's not true.

 7   Q.   Were the pictures you asked for pictures in sexual poses?

 8   A.   They were not.

 9   Q.   What were they?

10   A.   They were just mirror images of themselves.

11   Q.   Did you do this frequently?

12   A.   Do what?

13   Q.   Ask boys on the internet for pictures.

14   A.   Yes.

15   Q.   Now, a few times we heard you threatening boys that if

16   you didn't -- if they didn't send you pictures, you would

17   post their picture on the internet --

18   A.   I never said anything --

19   Q.   Say what?

20   A.   -- on the internet for their friends to see.

21   Q.   You anticipated my question.  My question was --

22   A.   It's been questioned by the prosecutor many times.  And I

23   did not do that.

24   Q.   You didn't --

25   A.   I did not.
```

1   that's beside the point.  That it was usually generated by

2   me, that I made up the name Good Action Bibs or Self-made.

3   And that's not true.  I actually downloaded that.  And not

4   knowing what Self-made or Good Action Bibs is, I did download

07:11  5   it, but I did not know what was inside of it.  It was

6   downloaded onto my computer.

7   Q.   From who?

8   A.   By me.  I did download the folder.

9   Q.   Where did you get it?

07:11  10   A.   I got it from Karucem on GigaTribe.

11   Q.   How does that work?

12   A.   Well, you download GigaTribe.  You install it.  And then

13   you're able to add the person, which I did.  He gave me his

14   GigaTribe account and I added him.  And then he posted a

07:11  15   folder and I did a download on the folder.

16   Q.   And then when you downloaded it, did you open -- did you

17   download all of the little video -- or the videos within the

18   folder or did that happen automatically?

19   A.   No, that happened automatically.  Once you download a

07:11  20   folder, it downloads all the contents inside the folder

21   without you knowing what's inside the folder.

22   Q.   And did you look at some of the videos that were in the

23   folder?

24   A.   I did.

07:11  25   Q.   And how long did you look at them for?

1   A.   If they were disturbing, I looked at them for maybe a

2   second.  And if I didn't find them disturbing, I would view

3   them.  But I didn't keep viewing them.  I viewed them once

4   and either I deleted it or I just forgot to delete it and it

07:11   5   was just left on the computer.

6   Q.   And how would you define what you found disturbing?

7   A.   I would definitely find disturbing that a man was having

8   sexual intercourse with a six-year-old.  But we also don't

9   know what happens in that set of video, nor do I.  So it's

07:11   10   all speculation.

11   Q.   But these videos that had child pornography on it, kids

12   engaged in sex, you found disturbing; is that correct?

13   A.   I believe so.

14   Q.   And did you try to delete any of them?

07:11   15   A.   I did delete a lot of them.

16   Q.   The government said there were thousands of files deleted

17   in your permanently deleted area that they recovered.

18   A.   Actually, they never recovered any permanently deleted

19   because they didn't want to make me seem any sort of person

07:11   20   that would delete any of those files.  So what they did is

21   actually they looked in my recycle bin and they found four

22   files, none of which we know the title of because it's all

23   random numbers.  All we know is what I did have on the

24   computer at the time.  They contained it.

07:11   25   Q.   But did you hear the witness for the government saying

1  Q.   And where was your cell -- your iPhone?

2  A.   My iPhone was under my covers of the bed.

3  Q.   Were your covers on the bed?

4  A.   My covers were on the bed all covering my electronic

5  (inaud.).

6  Q.   And did there come a point after you went back out to the

7  table that you were asked to bring out any other electronics?

8  A.   Yes.  My phone, my computer, in which again I stated

9  that -- in which I again state that I brought out my MacBook

10 and my iPad but did not bring iPhone due to the fact that it

11 was charging.

12 Q.   Okay.  At that point, what did Agent Ginther or Agent

13 Schwartzenberger do regarding your iPad or your MacBook?

14 A.   They searched it.  I gave Laura Schwartzenberger the

15 opportunity to (inaud.) it.  And I gave the (inaud.) after

16 it.  And after I gave it to her, she noticed that there was

17 nothing in it.  And then she said, You can keep that.  And

18 then Jason Ginther took my MacBook Pro and started -- he

19 didn't search it heavily.  He opened it up in which he asked

20 me for the password and I gave the password to the Mac OSX

21 partition of the computer and he started just thumbing

22 through, you know, the applications.  But then he was doing

23 that in front of me, but then he turned the computer over to

24 his side so that he could look at it.  And I did not know

25 what he was doing or what he was looking at.  I didn't know.

1  Q.  Prior to that happening, had you been asked by Agent

2  Schwartzenberger for consent for them to go through your

3  electronics?

4  A.  No, I did not.  I didn't -- I did not consent.  It was

07:12  5  more of when getting into that matter, neither was I shown

6  any papers of consent.

7  Q.  At that point?

8  A.  At that point, no.

9  Q.  What happened next?

07:12  10  A.  After that?

11  Q.  Let me ask you specifically.

12  A.  Okay.

13  Q.  Did you ask Agent Schwartzenberger to go outside so your

14  parents wouldn't hear what you were saying?

07:12  15  A.  No, I did not.

16  Q.  How did you end up outside?

17  A.  Laura on the record states that I admitted that I was not

18  gay, I was bi inside.  And that I admitted to -- to Rebecca

19  Till105.  The funny fact is that my parents were also inside.

07:12  20  And why would I -- if I wanted to go outside for my parents

21  not to hear, why would I admit everything inside for my

22  parents to hear?  So those factual findings are not factual

23  at all.  They're lies.

24  Q.  What did you say to Agent Schwartzenberger about Rebecca

07:12  25  Till eventually and about going outside?

1    A.   So after she had asked me again if I was RebeccaTill105, I

2    had been refusing and saying no.   And she finally said, Okay,

3    we need to go outside and talk.   And also including my mom,

4    who was interrupting many times, which then Laura was just

07:12   5    getting so irritated that she thought it was better to talk

6    with me outside.   And when my parents had objected to that,

7    Laura and Ginther said no, because he's over age.   And after

8    I was demanded to go outside, I went outside with Laura to

9    talk with her privately.   My parents could not be there.

07:12   10   Q.   Did you request that or did they request it?

11   A.   Laura requested it.

12   Q.   And did you do it?

13   A.   I did agree.

14   Q.   And when you were outside, did you basically tell Special

07:12   15   Agent Schwartzenberger the things she said you told her?

16   A.   She had asked me questions in which -- in which I -- I

17   did answer some of the questions were not -- some of the

18   answers or questions were not completely honestly, but it was

19   not me making a statement or me wanting to make a statement.

07:12   20   It was her basically having to force it out of me.   I had

21   said I won't answer that, in which she continued to ask it a

22   different way in which I did answer the question eventually.

23   Q.   But you did basically say what she says you said; is that

24   right?

07:12   25   A.   Essentially, yes.

1   Q.   When you were outside, did she give you a consent form to

2   sign?

3   A.   **No, she did not.**

4   Q.   Without telling me what she said, did she threaten you in

07:12   5   any way outside to get you to make these statements?

6   A.   **She made promises.  She coerced me and she threatened me.**

7   Q.   Did there come a time when you went back inside?

8   A.   **Pretty much after the interrogation was done outside, she**

9   **asked that I go back inside.**

07:12   10   Q.   And what did you do?

11   A.   **I went back inside.**

12   Q.   Why didn't you just walk out of your backyard and leave?

13   A.   **I felt if I did that, I would get shot.**

14   Q.   Did you go back in the house?

07:12   15   A.   **I did.**

16   Q.   What happened when you went back in the house?

17   A.   **After I came back inside, I noticed Ginther had papers**

18   **and handed it over to Laura, in which Laura placed it on top**

19   **of the table and said, We need to take your stuff.  And**

07:12   20   **she -- and what I saw was a consent to search computers form.**

21   **Not having the knowledge of what that form even meant, I**

22   **thought the form meant that they needed to search it outside**

23   **of -- outside of my home at their headquarters, not inside my**

24   **home.**

07:12   25   Q.   Did you read the form?

```
 1    A.   He works very hard.

 2    Q.   Would you estimate that each day that we've been in court

 3    there's been about six hours of testimony?

 4    A.   It guess.

 5    Q.   Maybe a little more sometimes?

 6    A.   Yeah, some testimony has gone over the next day.

 7    Q.   And five times six is about 30 hours; is that right?

 8    A.   Yes.

 9    Q.   So -- have you in this courtroom over the last five days

10    heard a lot more evidence and a lot more testimony about

11    what's happened in this case than the magistrate heard in

12    that eight -- seven and a half, eight hours of that hearing?

13    A.   Yes.

14    Q.   Now, let me ask you about certain of the evidence that

15    the government has introduced in front of the jury.

16    A.   Okay.

17              MR. SCHWARTZ:   And I thank you in advance, the

18    assistant U.S. attorney for helping us with this.

19    BY MR. SCHWARTZ:

20    Q.   Government's Exhibit 7 was an Apple MacBook Pro laptop

21    computer.  Did you consent to that Apple MacBook computer

22    being seized from your house?

23    A.   Did not consent.

24    Q.   Exhibit Number 8 was an Apple IPhone.  Did you consent to

25    that Apple IPhone?
```

07:12 (lines 5, 10, 15, 20, 25)

```
 1    A.   I did not consent.

 2    Q.   Being seized from your house?

 3    A.   I did not consent.

 4    Q.   Exhibit Number 9 is a SanDisk USB thumb drive.  Did you

 5    consent to that being seized from your house?

 6    A.   I did not consent.

 7    Q.   And I believe that's already there on the table.

 8              Exhibit Number 10 is a consent to search form.  Did

 9    you sign that consent to search form before the agents

10    searched your computer and iPhone?

11    A.   I did not sign that before they searched it.

12    Q.   Exhibit Number 12-A and 12-B, 12-C, are hash value

13    reports from the image -- from the laptop computer image hard

14    drive hash value verification screen shot.  Did you give

15    anybody permission to go through your computer and access

16    these exhibits?

17    A.   I did not consent.

18    Q.   13 A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R,

19    S, T, U, V are examination reports from your MacBook, the

20    examination reports of a mobile sync backup, summary chart of

21    Kik chats, Apple mobile sync backup folder, Apple mobile sync

22    folder Kik, P list, virtual screen shot, MacBook laptop --

23    I'm sorry -- virtual machine screen shot, et cetera, et

24    cetera, lantern report, lantern report, lantern report,

25    lantern report screen shot, lantern report screen shot, et
```

07:12 (lines 5, 10, 15, 20, 25)

1    cetera, up through a file tree for recycle bin of MacBook Pro

2    laptop computer.

3              Did you give the government the right to go through

4    your computer and extract those items?

07:12   5    A.   I did not get give consent.

6    Q.   And 14-A through C are disks with Google searches from

7    your computer and other Google search items.

8    A.   Which computer?

9    Q.   The MacBook Pro, the laptop.   Did you give the government

07:12  10    consent to take that from your computer?

11    A.   I did not give consent.

12    Q.   15-A through -- and D are reports from the MacBook

13    regarding the Window system or the NT user data files or date

14    files.   Did you give consent to that?

07:12  15    A.   I did not give consent.

16    Q.   How about 16-A through O screen shots from GigaTribe from

17    the MacBook, did you give permission to that?

18    A.   I did not give consent.

19    Q.   How about 17-A and B, disks from the GigaTribe chat from

07:12  20    MacBook Pro laptop or summary charts of the GigaTribe chats?

21    A.   I did not give consent.

22    Q.   And 19 and 20 all contain -- I'm sorry.   19 contains

23    GigaTribe (sic) chats with Mason Frost and Cook and Vanyher.

24    Did you give consent to them to access that?

07:12  25    A.   Could you repeat that?   I didn't have any GigaTribe chats

1   with Frosty or Mason.

2   Q.  I'm sorry.  With Kik chats.

3   A.  **I did not give consent.**

4   Q.  If the search warrant was based on all of this evidence,

07:12   5   did you give anybody consent to access your Dell computer?

6           MR. WIDLANSKY:  Objection, Your Honor.  It's a

7   misstatement of the law, assumes facts not in evidence.

8           THE COURT:  Overruled.

9   A.  **I don't understand the question.**

07:12   10  BY MR. SCHWARTZ:

11  Q.  It was probably a bad question.  Did you give anybody

12  consent to search your Dell computer or to retrieve anything

13  from it?

14  A.  **On February 11th, 2014, I was coerced into giving this**

07:12   15  **up, which then gave probable cause for a search warrant on**

16  **March 6th.**

17          MR. WIDLANSKY:  Your Honor, that was

18  non-responsive.

19          THE COURT:  Overruled.

07:12   20  BY MR. SCHWARTZ:

21  Q.  Did you -- the Dell computer contained videos of child

22  pornography from GigaTribe; is that correct?

23  A.  **Yes.**

24  Q.  Did you download that file that contained that

07:12   25  pornography knowing what was in it?

1    on GigaTribe, you clicked on it or opened GigaTribe?

2    A.  **Yes.**

3    Q.  By the way, do you know the ages of the children in those

4    videos?

07:12  5    A.  **No, I don't.**

6    Q.  Do you know -- withdrawn.

7            Did you ever get pictures of the nude bodies of

8    boys for sexual purposes?

9    A.  **Never.**

07:12  10           MR. SCHWARTZ:  No further questions at this time.

11           THE COURT:  Cross?

12

13                      *CROSS-EXAMINATION*

14   BY MR. WIDLANSKY:

07:12  15   Q.  Good afternoon, Mr. Killen.

16   A.  **Good afternoon, Ben.**

17   Q.  I'm sorry.  What did you call me?

18   A.  **Ben.  I believe that's your name, but I may be incorrect.**

19   **Widlansky.**

07:12  20   Q.  We've talked a lot about form.  About how you didn't give

21   consent even though we heard earlier that a magistrate judge,

22   a neutral and detached magistrate found you did.  We heard a

23   lot about form when Mr. Schwartz was examining you, didn't

24   we?

07:12  25   A.  **Forms or form?**

```
 1   A.   Yes.

 2   Q.   Now, that event we've heard a lot about.  That event

 3   involved Special Agent Schwartzenberger and Special Agent

 4   Ginther coming to your house in the morning of February 11th;

 5   is that correct?

 6   A.   Yes.

 7   Q.   And you say you didn't consent.  A federal magistrate

 8   judge disagrees with you.  But whatever happened during that

 9   day, they left with pieces of your digital media; is that

10   correct?

11   A.   Yes.

12   Q.   They left with your MacBook Pro?

13   A.   Yes.

14   Q.   They left with your iPhone?

15   A.   Yes.

16   Q.   They left with two thumb drives?

17   A.   Yes.

18   Q.   And the MacBook Pro, the iPhone, and one of the thumb

19   drives are on that table right now, aren't they?

20   A.   Yes, the ones that were thoroughly coerced are on that

21   table.

22   Q.   And after that, after February 11th, 2014, after the FBI

23   came to your house, frightened you half to death, as you say,

24   and coerced -- your words -- you would have given these --

25   these devices up.  You immediately went on to all of your
```

1    and a half months after Special Agent Schwartzenberger and

2    Special Agent Ginther came to your house, you went on the

3    fake Facebook account that you had made and changed the

4    profile picture?

07:13  5    A.  **As shown in the evidence, yes.**

6    Q.  And you did this despite the conversation you had with

7    Special Agent Schwartzenberger about exactly this conduct,

8    right?

9    A.  **Repeat the question.**

07:13  10   Q.  Are you okay.  You need a drink of water?

11   A.  **I'm fine.**

12   Q.  Are you sure?

13   A.  **Yes.**

14   Q.  Special Agent Schwartzenberger came to your house and

07:13  15   took your stuff because you were extorting boys and

16   sending -- demanding pictures of them, right?  That's why she

17   came?

18   A.  **Because I extorted an adult male that pretended to be the**

19   **boy for pictures, yes.**

07:13  20   Q.  Earlier you just said to me, sir, that you admitted that

21   you extorted from young boys.  You admitted that?

22   A.  **Yes.**

23   Q.  Okay.  So Special Agent Schwartzenberger came to your

24   house, took your stuff because you were committing these acts

07:13  25   of extorsion?

```
 1   A.  To an adult male who pretended to be a boy.  The father,

 2   not the boy.  She only gained the (inaud.) after she

 3   apparently coerced for the devices.  Then she got the

 4   evidence.

 5   Q.  Well, I'm not asking about the evidence.  I'm asking

 6   about what you did.

 7   A.  Please ask that.

 8   Q.  I thought I did.  Let me be very, very clear.

 9            MR. SCHWARTZ:  Your Honor, I object.  The question

10   was why Special Agent Schwartzenberger took the computer, not

11   whether he had extorted other boys.  He's answered it.  And

12   I'd ask that the prosecutor have to go on to other questions.

13            THE COURT:  All right.  Next question.

14   BY MR. WIDLANSKY:

15   Q.  You heard from Heather Freeman, Tara Jo Frost and Terry

16   Cook during this trial, did you not?

17   A.  Yes.

18   Q.  And you heard that all three of their sons were under the

19   age of 15 and living in states not in Florida, right?  You

20   heard that?

21   A.  Yes.

22   Q.  And you heard that they were living there when you

23   extorted pictures from them?

24   A.  Living where?

25   Q.  Outside the state of Florida?
```

         1    to make their own determination as to whether or not this

         2    constitutes child pornography.  And again I apologize, ladies

         3    and gentlemen of the jury.

         4              (Video playing)

07:13    5              MR. WIDLANSKY:  We have completed showing a very

         6    small part of that video.

         7    BY MR. WIDLANSKY:

         8    Q.  Mr. Killen, I'd like to talk a little bit more about the

         9    conversation you had with Special Agent Schwartzenberger on

07:13   10    February 11th.

        11    A.  Okay.

        12    Q.  Now, initially you told her that you were not Rebecca

        13    Till?

        14    A.  Initially, yes.

07:13   15    Q.  And then initially you told her you never used

        16    Zac(inaud.)05 as the e-mail address?

        17    A.  That may be true.  I may have said I don't remember or

        18    that I didn't use it.

        19    Q.  You told her that you didn't use it, correct?

07:13   20    A.  I may have actually said that, yes.

        21    Q.  Those were both lies, correct?

        22    A.  They were both lies.

        23    Q.  And then when you went outside, and you continued the

        24    conversation, you told her, in fact, that you were Rebecca

07:13   25    Till, right?

1    A.   After I refused to answer the question again, yes, she

2    eventually coerced me in into answering her questions.

3    Q.   You told her that you were Rebecca Till, correct?

4    A.   I did.

07:13   5    Q.   You didn't tell her at that time that you were Chanel

6    Izzabel?

7    A.   I did not.

8    Q.   You didn't tell her at that time that you were

9    BeverlyHills05?

07:13   10   A.   I did not.

11   Q.   You didn't tell her at that time that you were on

12   GigaTribe?

13   A.   I did not.

14   Q.   Let's talk about GigaTribe a little bit.

07:13   15   A.   Okay.

16   Q.   You mentioned early that you agreed that you as

17   BeverlyHills05 engaged in GigaTribe chats with a fellow named

18   Karucem; is that right?

19   A.   Yes.

07:13   20   Q.   And you mentioned earlier that you basically just did

21   what he told you to do and that you downloaded these blind

22   folders from him and then none of the videos that you looked

23   at gave you sexual gratification.  That's what you testified

24   about, right?

07:13   25   A.   That's what I testified, yes.

```
 1   A.   I don't.

 2   Q.   You do not remember?

 3   A.   I don't remember them.

 4   Q.   Okay.  This trial wasn't that important to you for you to

 5   pay attention?

 6          MR. SCHWARTZ:  Objection, Your Honor.

 7          THE COURT:  Overruled.

 8          MR. SCHWARTZ:  Argumentative.

 9   A.   I'm not answering that question.

10          MR. WIDLANSKY:  Your Honor, at this time I think --

11   hold on a second.

12   A.   He got his feelings hurt.  Now he's going to his

13   prosecutor attorney Robert Emory.

14   BY MR. WIDLANSKY:

15   Q.   I'm showing you Government's (inaud.).  19-B.  These are

16   Kik chats between you and Frosty2499?

17   A.   Yes.  They were coerced from my MacBook.  I agree with

18   that.

19   Q.   I didn't ask you a question.  You're Chanel Izzabel,

20   right?

21   A.   Yes.

22   Q.   And we heard from Ms. Tara Jo Frost during this trial,

23   right?

24   A.   Yes.

25   Q.   And we saw his birth certificate?
```

07:13  5
07:13  10
07:13  15
07:14  20
07:14  25

```
 1    BY MR. SCHWARTZ:

 2    Q.   Do you know a singer by the name of Justin --

 3    A.   Bieber.

 4    Q.   -- Bieber?

 5              MR. WIDLANSKY:  Your Honor, irrelevant.  Beyond the

 6    scope.

 7              THE COURT:  Counsel, if you want to get into this,

 8    fine, but it wasn't brought up in cross-examination and it's

 9    going to be a new area.  Then we're going to open up --

10              MR. SCHWARTZ:  Okay.  I don't want to open up a new

11    area, Judge.  And just he was told that he stole a picture

12    that he got from the internet.  I'm trying to show that it's

13    a regular practice of everyone to use public domain items on

14    the internet.  If Your Honor feels I shouldn't go further,

15    I'll certainly stop.

16              THE COURT:  I just want to alert you that if it's

17    going to be a new area, that we're going to give it the same

18    latitude.

19              MR. SCHWARTZ:  Then I'll stop asking the question.

20    BY MR. SCHWARTZ:

21    Q.   You were asked about statements that, That boy's hot, I

22    saw him in person and he's hotter than his pictures.  Do you

23    remember that?

24    A.   I do remember that.

25    Q.   Were you talking about that in a sexual sense?
```

1  A.  Not in a sexual sense, no.  I was just saying that

2  because I was going along with what Karucem was saying about

3  boys being hot.

4  Q.  Have you ever seen a picture of an actress or a singer or

07:14  5  somebody who you thought was hot?

6  A.  Yes.

7  Q.  And is that a sexual reaction or is that just admiring

8  the attributes of a person?

9  A.  They may have some good characteristics about them.

07:14  10  Q.  In following up on the prosecutor's line of questioning,

11  when you got these pictures of these boys standing naked in

12  front of a mirror, was it for sexual purposes?

13  A.  It was not intended for sexual purposes at all, actually.

14      MR. SCHWARTZ:  I have no further questions, Judge.

07:14  15      THE COURT:  All right.  Thank you.  You may step

16  down.

17

18  *    *    *    *    *    *    *    *    *    *

19      (Thereupon, proceedings were held but not transcribed.)

20  *    *    *    *    *    *    *    *    *    *

21

22      (Thereupon, the above portion of the trial was concluded.)

23

24          *         *         *

25

1

<u>C E R T I F I C A T E</u>

2

3          I hereby certify that the foregoing is an accurate

4    transcription of the proceedings in the above-entitled

5    matter.

6

7          08/10/2015

8    _____           _____

9    DATE COMPLETED             GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25