```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3              CASE NUMBER 15-20106-CR-MOORE
 4
    UNITED STATES OF AMERICA,
 5
                Plaintiff,              Courtroom 13-1
 6
      vs.                               Miami, Florida
 7
    PATRICK KILLEN,                     October 22, 2015
 8
                Defendant.
 9
10                 SENTENCING PROCEEDINGS
       BEFORE THE HONORABLE K. MICHAEL MOORE
11       CHIEF UNITED STATES DISTRICT JUDGE
12
    APPEARANCES:
13
    FOR THE GOVERNMENT:    ROBERT J. EMERY, AUSA
14                         BENJAMIN J. WIDLANSKI, AUSA
                           United States Attorney's Office
15                         99 Northeast 4 Street
                           Miami, Florida 33132
16                                         305-961-9421
                                      Fax: 305-530-7976
17
    FOR THE DEFENDANT:     FRED A. SCHWARTZ, ESQ.
18                         Kopelowitz Ostrow Ferguson
                           Weiselberg Keechl, P.A.
19                         200 East Palmetto Park Road
                           Suite 103
20                         Boca Raton, Florida 33432
                                           561-910-3070
21                                    Fax: 561-409-0882
22  REPORTED BY:           GILDA PASTOR-HERNANDEZ, RPR, FPR
                           Official United States Court Reporter
23                         Wilkie D. Ferguson Jr. US Courthouse
                           400 North Miami Avenue - Suite 13-3
24                         Miami, Florida  33128   305.523.5118
                           gphofficialreporter@gmail.com
25
```

1

## TABLE OF CONTENTS

2

Page

3

4

Agent Laura A. Schwartzenberger ........................... 7

Direct Examination by Mr. Emery ..................... 7

Cross-Examination by Mr. Schwartz .................. 16

Redirect Examination by Mr. Emery ................. 21

Reporter's Certificate .................................. 66

5

6

7

8

9

10

11

12

13

## EXHIBITS

14

| Exhibits Description | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| | Page | Line | Page | Line |
| Government's Exhibit Number 1S ...................... | 6 | | 2 | |
| Government's Exhibit Numbers 3S, 4S and 5S ......... | 34 | | 22 | |

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were at 2:35 p.m.:)

2            THE COURTROOM DEPUTY:  United States versus Patrick

3  Killen.

4            MR. EMERY:  Good afternoon, Your Honor.  Rob Emery for

5  the United States.  Along with me is my co-counsel, Benjamin

6  Widlanski.

7            MR. WIDLANSKI:  Good afternoon, Your Honor.

8            THE COURT:  Good afternoon.

9            MR. EMERY:  And the case agent, FBI Special Agent Laura

10  Schwartzenberger, will be in here in one minute, Your Honor.

11            THE COURT:  Okay.

12            MR. SCHWARTZ:  Good afternoon, Your Honor.  Fred

13  Schwartz representing the defendant, Patrick Killen, who's

14  present in the courtroom.

15            THE COURT:  Good afternoon.  Okay.  You want to start

16  with your objections, Mr. Schwartz?

17            MR. SCHWARTZ:  If I might.  Does he have to remain

18  handcuffed, Judge?

19            THE COURT:  Pardon me?

20            MR. SCHWARTZ:  Does he have to remain handcuffed?

21            THE COURT:  Yes.

22            So your first objection, as I understand it, is to the

23  offense level computation as to groups 1, 2, 3 and 7 through

24  258.

25            MR. SCHWARTZ:  Correct, Your Honor.

1          THE COURT:  The defendant reiterates his position that

2    the naked images procured by the defendant in this case do not

3    constitute lewd and lascivious poses or involve sexual conduct.

4    Anything further on that?

5          MR. SCHWARTZ:  As to that position, no.  As to a number

6    of the counts, I would raise a second objection, and that is

7    that we have no evidence as to the age of approximately -- of

8    all but about 11 of the people that the Government is referring

9    to.  But first, I suggest that the argument I made during the

10   trial, that the statutory definition under the statute doesn't

11   include an individual standing in front of a mirror naked.

12         THE COURT:  All right.  Is that all on that one?

13         MR. SCHWARTZ:  On that one, yes.

14         THE COURT:  Anything from the Government in response?

15         MR. EMERY:  Yes, Your Honor.  The Government would just

16   as noted in the response -- the testimony of Special Agent Susan

17   Ostrobinski where he specifically testified about the responses

18   from Kik where based on the Kik business records, you could see

19   that the defendant had received, as she put it, hundreds of sex

20   explicit images specifically of boys under the age of 18,

21   sending the defendants pictures of their erections, and that's

22   what she testified to at trial.  Also, Special Agent

23   Schwartzenberger testified that based on the Kik chats that were

24   in the Mobile Sync backup folder on the defendant's MacBook,

25   that there were approximately 30 to 35 conversations that the

1    defendant had while pretending to be Chanel Izzabel, the

2    14-year-old female cheerleader, and all those boys also sent the

3    defendant pictures of their erections.

4         Separately, Your Honor, the Government also has an

5    exhibit that we would like to introduce which is a chart which

6    pretty much summarizes what I just talked about.  It was

7    prepared by Special Agent Schwartzenberger based on her review

8    of the evidence that was submitted into evidence, and it's

9    Government 2S.

10        THE COURT:  Has Mr. Schwartz been provided a copy of

11   that?

12        MR. EMERY:  He has, Your Honor.

13        MR. SCHWARTZ:  And I don't object to the chart being

14   admitted.  I disagree with the conclusion they come to, and I'll

15   state that when Your Honor asks me.

16        THE COURT:  Okay.

17        MR. EMERY:  I could call Special Agent Schwartzenberger

18   to explain the chart a bit, Your Honor.

19        THE COURT:  Okay.

20        MR. EMERY:  Judge, what you'll also get a copy of, and

21   defense counsel, is Government 1S which we filed in our response

22   which are the selected excerpts of the defendant's testimony at

23   trial.  At this time I would move to admit Government's 1S.

24        THE COURT:  No objection?

25        MR. SCHWARTZ:  No objection, Judge.

1          THE COURT:  All right.  Be admitted.

2      (Government's Exhibit Number 1S was received in evidence.)

3          THE COURT:  Okay.  You've got a copy of the chart

4  there?

5          MR. EMERY:  Yes.  Could I have the ELMO, Your Honor?

6          THE COURT:  Is that not light enough?

7          Do you have another copy of it?

8          MR. EMERY:  I do.

9          THE COURT:  You want to give it to the witness?

10          MR. EMERY:  Yes.

11          THE COURT:  And could I have the witness sworn in,

12  please?

13          THE COURTROOM DEPUTY:  Would you raise your right hand,

14  please?

15              SPECIAL AGENT LAURA SCHWARTZENBERGER

16                  GOVERNMENT'S WITNESS, SWORN.

17          THE COURTROOM DEPUTY:  Thank you.  Please state your

18  full name for the record.

19          THE WITNESS:  Laura, spelled L-a-u-r-a, middle initial

20  A, last name Schwartzenberger.  That's

21  S-c-h-w-a-r-t-z-e-n-b-e-r-g-e-r.

22          THE COURTROOM DEPUTY:  Thank you.

23          THE COURT:  Agent, do you see that little -- to the

24  right of you, there's a little document there that says, "place

25  document here."  It's to the right of you.

1          THE WITNESS:  Oh, yes.

2          THE COURT:  Could you put that document there?

3          MR. EMERY:  So, Your Honor, based on my understanding

4    then, this document has been admitted and Special Agent

5    Schwartzenberger is going to explain what this chart means.

6          THE COURT:  Yes.  Okay.

7                     DIRECT EXAMINATION

8    BY MR. EMERY:

9    Q.  Now, Special Agent Schwartzenberger, did you prepare this

10   chart?

11   A.  Yes, I did.

12   Q.  And why did you prepare this chart?

13   A.  So that I could keep track of the victims of Patrick Killen,

14   Jr. that I could possibly identify through usernames.

15   Q.  And did you then place that information in this chart?

16   A.  Yes, I did.

17          MR. EMERY:  Your Honor, it's going to be a little

18   easier for me if you put it up on the ELMO right there, if you

19   don't mind.

20          THE COURT:  All right.

21          MR. EMERY:  May I approach?

22          THE COURT:  Yes.

23   BY MR. EMERY:

24   Q.  Now, we will talk about then -- I know initially that

25   probation, the probation office was provided a number of 255

Schwartzenberger - Direct

8

1  victims; is that correct?

2  A.  Yes, that's correct.

3  Q.  And after that number was provided to U.S. Probation, did

4  you continue to conduct a further review of the evidence in this

5  case?

6  A.  Yes, I did.

7  Q.  And did you come to a final number that you determined that

8  you could link as far as victims to the defendant, Patrick

9  Killen?

10  A.  Yes.

11  Q.  And what was that number?

12  A.  288.

13  Q.  Okay.  Now, I want to talk about then in Government's 2S how

14  we got to that number.

15       So I'm showing you the first page of Government's 2S.

16  For example, I want to talk about at the top here it says -- at

17  the top it says name.  Is that the name of the minor that you

18  identified?

19  A.  Yes, it is.

20  Q.  And in the next column, that's the address?

21  A.  Yes.

22  Q.  And then I see what's -- the next name is the Kik username?

23  A.  Yes.

24  Q.  Where did you obtain the Kik username from?

25  A.  From either electronic devices that we obtained from Patrick

Schwartzenberger - Direct

1   Killen, Jr. or from Kik response to mutual legal assistance

2   treaty.

3   Q.   And then the next line is Instagram username?

4   A.   Yes.

5   Q.   What is that?

6   A.   Their username on Instagram, and we obtained that

7   information from the same two places.

8   Q.   What's then webcam username?

9   A.   The same username they used in different webcam platforms.

10  Q.   And what about on the right, what does the legend mean?

11  A.   That's just a legend to help me keep track of where we are

12  in the process with each victim such as, have we served

13  subpoenas to Instagram or Kik or Facebook to determine the

14  identities of the children?  Have we identified them?  Have

15  leads been sent to other divisions to contact the children and

16  interview them?  And then finally, have the children's images

17  and videos been sent to the NCMEC which is the National Center

18  for Missing & Exploited Children?

19  Q.   Now, for the 288 number that you just mentioned, did you

20  personally interview all 288 children?

21  A.   No, I did not.

22  Q.   How many did you personally interview?

23  A.   Well, personally I interviewed I believe two, but I believe

24  it's 11 victims, they were interviewed by law enforcement, just

25  other agents.

1  Q.  Okay.  Other FBI agents?

2  A.  Correct.

3  Q.  Okay.  So let's talk then about where at the top where it

4  says victim identified through complaints, I see that there are

5  two lines there; is that correct?

6  A.  Correct.

7  Q.  Okay.  And, for example, let's talk about the red one.  It

8  says SAKA and then we redacted the names of the minors for their

9  privacy; is that correct?

10 A.  That's correct, yes.

11 Q.  And when it says, victim identified through complaints, is

12 that because they had reported to law enforcement that they had

13 been victimized?

14     MR. SCHWARTZ:  Your Honor, may I ask that the picture

15 be taken down from the screen?  I'll explain why in a moment.

16     THE COURT:  What's the reason?

17     MR. SCHWARTZ:  Well, at least as to one of them, they

18 took out most of his name, but if you go across to his address,

19 you can see what his name is and I don't think that should be

20 publicized.

21     THE COURT:  You agree?  Counsel, do you agree with

22 that?

23     MR. EMERY:  You mean the user name?

24     MR. SCHWARTZ:  I don't want to publish this, but if you

25 look under the Instagram username, you have the person's full

1    name there on the first red line.  I don't know how often that

2    reoccurs.

3            MR. EMERY:  Okay.  Judge, we can go ahead and, if we

4    can, take it off the screen.  I can just talk to the agent about

5    it.

6            THE COURT:  Well, I have taken it off the monitors.  Do

7    you still have it on yours?

8            THE WITNESS:  No, sir.

9            THE COURT:  Do you have it now?

10           THE WITNESS:  Yes, I do.

11           THE COURT:  Okay.

12           MR. SCHWARTZ:  Thank you.

13           MR. EMERY:  Thanks, Your Honor.

14   BY MR. EMERY:

15   Q.  Okay.  So then let's talk about the one in red that we just

16   talked about that says, SSA and then KA.  That was based on a

17   complaint?

18   A.  Correct, yes.

19   Q.  Okay.  And what about then the next line that says, "Victims

20   located in Kik chats in MobileSync backup file and Mac Pro

21   laptop"?  What is that?

22   A.  Yes, they are on Patrick Killen, Jr.'s MacBook Pro.  We

23   found a MobileSync backup file for his iPhone wherein there were

24   Kik chats for the period of August 26, 2013 through September

25   12, 2013, and these were victims identified from those chats.

1  Q.   And so that goes on then through Page 2?

2  A.   Yes.  There were approximately 47.

3  Q.   Okay.  And then I'm turning to Page 3 where it says,

4  "Victims located in Kik MLAT Supplemental Return?

5  A.   Yes.

6  Q.   Okay.  And then, for example, in the first line it says,

7  "Unknown 37," and then to the right there is a Kik username,

8  correct?

9  A.   Correct.

10 Q.   And how did you then identify that person as a victim of the

11 defendant's?

12 A.   Yes, in the Kik return that we received, there were a series

13 of photos and under each photo it would have the username that

14 sent the photo and the username who received the photo.  The Kik

15 MLAT return was for the account of RebeccaTill05.  So that was

16 one of the parties either sent or received and then the other

17 was the child's Kik user account.

18 Q.   Okay.  And so then through Unknown 37, does that go all the

19 way through Unknown 242?

20 A.   Yes.

21 Q.   Okay.  In talking about the Kik users from Unknown 37

22 through Unknown 242, they sent a picture to the defendant?

23 A.   Correct, or more than one photo, yes.

24 Q.   And did you personally review those photos?

25 A.   Yes, I did.  And only the victims who sent nude photographs

1    that included their genitalia were included in this.

2    Q.   Okay.

3    A.   Meaning there were some children that sent just, for

4    instance, a face picture, but I didn't find any nude photographs

5    for them, so they're not in this list.

6    Q.   They're not included.  But for all of the ones located in

7    the Kik MLAT Supplemental Return that you identified, had sent

8    the defendant a picture of their erection?

9    A.   Correct.

10   Q.   And what was the average age then of those boys?

11   A.   I would say they looked to be approximately 13 or 14 years

12   old.

13   Q.   Let's talk about the section then that says victims located

14   on MacBook Pro laptop which started at Unknown 243.  What is

15   that section about?

16   A.   Yes, so I looked on the MacBook Pro of Patrick Killen, Jr.

17   and I saw several additional pictures of children, nude images

18   of children, and I tried to match the faces of those children

19   with Instagram screenshots that Killen did and he had on his

20   MacBook Pro or Kik username or Kik chat screenshots.  He had a

21   lot of those.  So if I could match up the child that had the

22   nude photographs with a Kik username or an Instagram username,

23   then I included those.  Many of them I could not match up with

24   the usernames.

25   Q.   Okay.  But the ones you couldn't match up, what kind of

Schwartzenberger - Direct

1   photographs were those?

2   A.  They were nude images of the child which included their

3   genitalia.

4   Q.  So then from Unknown 243 -- okay.  Then with respect to the

5   -- does that then go up to Unknown 275?

6   A.  I believe so.  If you can scroll or move it over a little

7   bit so I can see where -- yes, that's correct, yes.

8   Q.  Okay.  Now, what did you then connect, for example, Unknown

9   243 through Unknown 275?  Again, that was based on what again?

10  A.  Determining if the child's nude image, the face of that

11  child matched an Instagram screenshot, that it was the same boy

12  or not.

13  Q.  Okay.  So then up from there, then at the top on the first

14  page, which starts with the initials K.E. through Unknown 275,

15  what is that final total?

16  A.  288.

17  Q.  And then what about the rest, for example, on the chart

18  where it says Unknown 276, it says Facebook, for example?

19  A.  Yes, Patrick Killen, Jr. also had many videos on his MacBook

20  Pro that were of boys masturbating; and generally, the name of

21  the video would include a date, the boy's name, oftentimes the

22  full name, sometimes just the first or last name; where they

23  came from, U.S., U.K., and the age.  For instance, it would say

24  12M or 13M, 14M, M meaning male.

25  Q.  But you did include those in 288, correct?

1   A.   I did not, no.

2   Q.   And why is that?

3   A.   Because I couldn't determine if Patrick Killen, Jr. created

4   those videos or asked the boys to create those videos for him or

5   if they were sent to him by another party.

6   Q.   But were these of boys under the age of 18?

7   A.   Yes, they were.

8   Q.   And they were engaged in what kind of sexual conduct?

9   A.   They were masturbating.

10   Q.   And that goes from Unknown 276 through the last page which

11   is Unknown 429, correct?

12   A.   Yes, that last one I believe was from a thumb drive, but it

13   was the same.  It was of a male, a boy masturbating, too.

14   Q.   Now, with respect to the address section, I notice that in

15   some locations, it says Switzerland, England.  What does that

16   mean?

17   A.   It means either through subpoenas or the IP address results

18   in Switzerland or England or some -- when it talks about the

19   videos later on, the name of the video had the boy in the U.K.

20   or it would say U.S. or U.K. or I.R., or something like that,

21   where the boy was.

22   Q.   All right.  So, here, for example, if the address was left

23   blank, what does that indicate?

24   A.   Most of those are in the United States.  There are a couple

25   of -- not the video part, but a couple of the photo section

 1   where they are outside the U.S., but most of them are in the

 2   United States.

 3   Q.   So besides then the 288 then, there were additional videos

 4   or images found on the defendant's electronic items that

 5   involves minors engaged in sexual explicit conduct?

 6   A.   Correct, yes.

 7   Q.   Now, this chart that you created, based on your training,

 8   experience and your knowledge of this case, does that capture

 9   each and every victim, minor victim of the defendant?

10   A.   No, not at all, no.  It's a very, very conservative

11   estimate.

12           MR. EMERY:  If I could have one minute, Your Honor?

13           THE COURT:  All right.

14   BY MR. EMERY:

15   Q.   Now, was everything then that you base this chart on

16   introduced at trial against the defendant?

17   A.   Yes, it was.

18           MR. EMERY:  No further questions, Your Honor.

19           THE COURT:  Cross.

20           MR. SCHWARTZ:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. SCHWARTZ:

23   Q.   Would you look at your chart, special agent, and can you

24   tell me how old Unknown 89 is?

25   A.   I don't have the chart in front of me, but I can tell you

1   that all those boys in the chart looked to me to be under the

2   age of 18.

3   Q.  That was your judgment?

4   A.  That's correct, yes.

5   Q.  If I'm looking at the chart -- and would you like a copy of

6   the chart so you have it in front of you?

7          MR. SCHWARTZ:  May I approach?

8          THE COURT:  All right.

9   BY MR. SCHWARTZ:

10  Q.  As I look at the chart -- and I may misunderstand the

11  legend, but it seems to me that the legend says three of these

12  people were interviewed; is that correct?  They're in red on the

13  cover chart.

14  A.  I'm sorry.  There's also -- the legend is a process.  So the

15  last part of the legend is in purple and that's information sent

16  to NCMEC and that is the last step.  So anybody in purple was

17  also interviewed.

18  Q.  Okay.  So I'll revise what I said.  Eight it appears to me

19  that -- I'm sorry.  Eight of the people on the chart were

20  interviewed; is that correct?

21  A.  That's correct, yes.

22  Q.  And as to another 17 of the people on the chart, you somehow

23  got an address that may or may not be correct and sent

24  subpoenas; is that right?

25  A.  Are you counting the ones in yellow?

1  Q.  Yes.  If I'm off -- I apologize if I'm off by one or two.

2  A.  Okay.  So the ones in yellow, yes, subpoenas were sent and

3  received back, and yes, sometimes in those cases, we were able

4  to get an address or some kind of contact information.

5  Q.  But the person wasn't interviewed?

6  A.  Correct, correct.

7  Q.  And then you identified five other people; is that correct?

8  A.  Correct.

9  Q.  And again, I apologize if my math is bad.  That's why I went

10 to law school.

11        That's about 20 some-odd people who were either -- or

12 25 -- who were either interviewed or sent subpoenas or perhaps

13 identified?

14 A.  Yes.  So it pretty much goes to 28, I think who, yes,

15 subpoenas were sent or they were interviewed or --

16 Q.  Well, but between 28 and 1, there are 2, 4, 6, 8, 10, 12,

17 about 14 people who you have no color for; is that right?

18 A.  I'm sorry.  It would be more than 28.  It would be 31, I

19 think, that we had at least the subpoena served.  And I'm sorry,

20 what was your other question?

21 Q.  Now, the ones you interviewed, you obviously know their age;

22 is that right?

23 A.  Correct, yes.

24 Q.  And the ones that you sent to the Center for Missing

25 Children, et cetera, you know their age, right?

1  A.  Yes.

2  Q.  The others, have you verified their age?

3  A.  Yes, because most of these others we were able to determine

4  their age because we compared their photographs that were

5  obtained from the Kik MLAT return or the MobileSync backup file

6  with the Department of Motor Vehicle's photographs.

7  Q.  Those are the colored -- the people whose lines have been

8  colored?

9  A.  So anything colored blue or higher down to purple, we know

10  their age.

11  Q.  The yellows you don't?

12  A.  Correct.

13  Q.  The whites you don't?

14  A.  Correct.

15  Q.  So if I'm correct, there are 13 people on this chart whose

16  age you know, and the rest you are trying to use your expert

17  face identification knowledge to determine their age; is that

18  right?

19  A.  Correct.

20        MR. SCHWARTZ:  And based on that, Judge, I would ask

21  Your Honor to reduce the number of individuals that they're

22  talking about in this report from the 258 or so, to only -- not

23  that it makes a lot of difference -- but to only those numbers

24  that are colored either blue, gold, green, red or purple.

25        THE COURT:  What other colors are there?

MR. SCHWARTZ:  On the chart there's a lot of yellow --
a number of yellow more than the 13 colored, the colors I named,
and there are pages and pages and pages and pages and hundreds
of people in white, who they've had no contact with in any
manner at all, haven't even gotten an address to send a subpoena
to; and we're relying on a very bright, very hardworking special
agent to tell us how old they are just from looking at them.
And I don't think that meets the standard of saying that this
was child pornography when you're dealing in these instances --
forgetting about the videos for a minute -- in these instances
with adolescents.  I've seen 15-year-olds who could be 25 and
20-year-olds who could be 15.

MR. EMERY:  Your Honor, I'm going to object.  Is he
cross-examining the witness or is he making an argument?  I
mean, it's --

THE COURT:  Well, he's making an objection right now in
the middle of the examination, and I guess he's finished.
What's the Government's response?

MR. SCHWARTZ:  I have no more questions at this point.

MR. EMERY:  I'd like to ask the witness a few more
questions, Your Honor.

THE COURT:  Okay.

MR. SCHWARTZ:  And for the record, Judge, I was
responding to your question of how many other colors are there,
and I sort of got carried away.  So I apologize.

1        THE COURT:  All right.  Well, did you want to continue

2   or do you want to --

3        MR. SCHWARTZ:  I have no more questions of this witness

4   on this subject, Judge.

5        THE COURT:  All right.  Go ahead.  Redirect.

6                    REDIRECT EXAMINATION

7   BY MR. EMERY:

8   Q.   Special Agent Schwartzenberger, when you spoke with the

9   defendant at his residence in February of 2014, did he admit to

10  how many boys he had obtained naked images from?

11  A.   He said approximately 50.

12  Q.   And that was using Kik?

13  A.   Yes.

14  Q.   Now, in your training and experience with the FBI, are you

15  trained as far as how to identify minors?

16  A.   Yes, I am.

17  Q.   And how is that?  For example, what are some things you're

18  trained on?

19  A.   We do, of course, look at their face and how old they look

20  according to facial features and also hair, if there's the

21  presence of hair, size and stature.

22  Q.   And with that training and experience, do you apply that to

23  the 288 number that you identified?

24  A.   Yes, I did.

25  Q.   And based on your training and experience, were all of the

1    images of children, of boys, of those 288 under the age of 18?

2    A.   Yes.

3    Q.   And were all those 288 images introduced at trial?

4    A.   Yes.

5         MR. EMERY:  No further questions, Your Honor.

6         THE COURT:  So Mr. Schwartz, is it material, this

7    number in terms of the guideline calculation?

8         MR. SCHWARTZ:  Your Honor, the probation officer

9    because of the number stacked a number of these counts and

10   reached a significantly high number where she's recommending the

11   defendant -- she can't recommend life because the statute

12   doesn't call for it, but I think she's recommending 274 years.

13   I might be off by a year or two.  This is not that significant

14   in making that determination.

15        THE COURT:  That's what I'm trying to get at.  Is there

16   somewhere in the Presentence Investigation Report where, whether

17   it's 50 or two hundred and -- what was it?  What was the number?

18        MR. EMERY:  288, Your Honor.

19        THE COURT:  288 that affects the guideline calculation?

20        MR. SCHWARTZ:  I believe the guidelines would go down

21   if it were 50.

22        THE COURT:  But where are we talking about in the

23   report?

24        MR. SCHWARTZ:  Well, if we were to look at --

25        MR. WIDLANSKI:  Your Honor, I believe it's Page 21.

1        THE COURT:  I'm there.

2        MR. SCHWARTZ:  I was at 19, but okay.

3        THE COURT:  Well, which paragraph?

4        MR. SCHWARTZ:  100, I believe.

5        THE COURT:  Okay.  So we are at 100.  I mean, I see

6  groups and --

7        MR. SCHWARTZ:  Yes.

8        THE COURT:  I mean, somewhere embedded in there has to

9  be your objection.  I don't know.

10        MR. SCHWARTZ:  I think the probation officer can

11  explain it.  I can try, but I think she would be more

12  articulate, Judge.

13        THE COURT:  Okay.

14        THE PROBATION OFFICER:  If Your Honor looks at Page 20

15  and starting at paragraph 93, those are the groups what we call

16  pseudocounts, those counts that involve the additional minors

17  that were not part of the Indictment and are not charged in the

18  other counts of the Indictment.  The guidelines tell us to

19  consider them, each one, treated as if it was one count of

20  conviction per minor.  And I obviously only provided what one

21  example, because I wasn't going to do the guidelines for 252

22  individuals.  Otherwise, it would have been pages and pages, a

23  voluminous PSI.  So I provided an example as to one.

24        Included in that example is an enhancement for the age

25  between 12 and 16 years of age.  So that might be an issue we

1   might want to look at.

2        And also once we get to paragraph 100, because we have

3   to assign units to each group, each of group 7 through 258,

4   which encompasses those 252 victims, he received an adjusted

5   offense level of 38. That's 252 units. The total number of

6   units is 256. There can only be an increase of five levels. So

7   anything above five units only receives a five-level increase in

8   offense level. So I think it's -- even if we had only 50

9   victims, an additional 50 victims, we would still have an

10   increase of five levels.

11        Of course, I would ask the Court to help me decide how

12   to revise this report, if we need to do so, to reflect the

13   correct number, but it's almost a moot point whether it's 50 or

14   more.

15        THE COURT: And that's my point.

16        MR. SCHWARTZ: And Your Honor is correct in that

17   regard. It would not reduce the ultimate offense level. Of

18   course, the PSI follows my client wherever he's assigned, and 50

19   as opposed to 256 or 280 or whatever the number is, is, of

20   course, less significant.

21        THE COURT: Well, I don't want to minimize the

22   significance of the issue, but to the extent that we can agree

23   that it wouldn't change the guidelines or the guideline

24   calculations, at least with respect to the number, one, I don't

25   think it's necessary to change it and, secondly, I don't think

 1  we should change it based on the testimony that's been

 2  presented.  To the extent that you want to argue the weight that

 3  should be attached to it as opposed to its consideration or

 4  calculation in the first instance, I think you can argue that.

 5  I think you may probably want to argue that later on in terms of

 6  the sentence that's being recommended.  But at least for

 7  guideline calculation purposes, I'm satisfied that there has

 8  been sufficient, reliable and trustworthy evidence as to the age

 9  and number of the individuals to use that as an accurate number.

10  So I'll note that objection and deny it.

11          MR. SCHWARTZ:  And the only other point I would raise

12  in that regard, Judge, is there is an enhancement if the

13  children are between 12 and 16, and I would challenge the

14  reliability of the agent's testimony that all of these children

15  are between the age of 12 and 16.

16          THE COURT:  All right.  That's a different argument.

17          MR. SCHWARTZ:  Right.

18          THE COURT:  And is that paragraph 94 that you're

19  arguing about now?

20          MR. SCHWARTZ:  Yes, Your Honor.

21          THE COURT:  So that's a two-level enhancement?

22          MR. SCHWARTZ:  Yes, Your Honor.

23          THE COURT:  Okay.  So again, ruling on that one, I'm

24  satisfied that the testimony of the witness is sufficiently

25  reliable based on her background, training and experience.  And

1  was that also a determination that the jury had to make on the

2  question of under the age of 16?

3          MR. SCHWARTZ:  As to the ones that evidence was

4  presented directly on, I would suggest it was.  I don't know how

5  they could have made it as to all of the others, but --

6          THE COURT:  Well, the offense characteristic just adds

7  two if it involved a minor.  Does it make a difference whether

8  it's one or 288?

9          MR. WIDLANSKI:  Well, Your Honor, I would note, just

10  going back to Mr. Schwartz's earlier point, there are, as

11  Mr. Schwartz has conceded, a number of victims who were

12  contacted, identified and their age was ascertained by Special

13  Agent Schwartzenberger.  Those specific victims, taking aside

14  all the other ones, but those specific victims, whose ages were

15  between the ages of 12 and 16 to get that two-point enhancement,

16  those victims alone would get us above a guideline offense level

17  of 43.  I mean, as Your Honor stated multiple times, we are

18  already in the realm of the academic.

19          THE COURT:  Okay.  So those two objections will be

20  denied.

21          Next objection.

22          MR. SCHWARTZ:  My next real objection, Judge, is to the

23  enhancement predicated on the fact that it's alleged that

24  Patrick perjured himself at trial, and I'd like to raise that to

25  the Court.  There obviously was a difference between the

1   testimony of the two special agents who gave a sequence of

2   events that occurred at Patrick's house when they did their

3   knock-and-talk and the testimony of Patrick's mother, father and

4   Patrick who gave a different sequence.

5          It was presented to the magistrate.  She took a long

6   time to rule, thought about it carefully, and finally ruled on

7   the side of the agents, suggesting that she had more faith in

8   what they said than what the three civilians said.  I presented

9   some of it at trial so the jury heard it.  I don't know that

10  there was any jury instruction relating to the illegality of the

11  search or the illegality of the statement by Patrick.  So I'm

12  not sure that that issue was directly before the jury.  But

13  obviously, Your Honor heard all of that testimony.

14         The mother, the father and Patrick are here.  They

15  steadfastly stick to their version of what happened on that day.

16  I'm sure the agents cling to their versions.  And in order to

17  crystallize that, we offered in our response to have Patrick and

18  the agent take a lie detector test by an independent polygrapher

19  and see what the results were.  The Government didn't take us up

20  on that.

21         But often in trial there are differences as to how an

22  event took place, particularly at events such as this, which was

23  clearly not a normal occurrence in the Killen household.  So

24  whether you believe the agent, whether you believe the Killens

25  or whether you think the Killens were mistaken or forgot or have

1    the events out of order, I suggest to the Court that this

2    doesn't rise to the level of obstruction of justice and,

3    therefore, he should not get an enhancement for obstruction of

4    justice for perjury.  Again, it may be academic because it would

5    not get the offense level down from 47 to 45, and even if I'm

6    successful in arguing that he also accepted responsibility, we

7    would still be at level 43.

8            THE COURT:  Well, if it's that academic, then we don't

9    need to make the objection, but you've made the objection, so

10   we've got to rule on it.  And you're right on two points.  First

11   of all, the fact that he took the stand and his parents

12   testified different than to what the Government witnesses

13   testified does not necessarily indicate that he perjured

14   himself, but it doesn't mean that he didn't perjure himself

15   either.  You've got to make a determination on the basis of the

16   testimony that you heard and I did hear that testimony and I

17   believe that I can probably identify at least three instances

18   where I can conclude by a preponderance of the evidence that he

19   perjured himself.

20           So he does have a right to testify, and he exercised

21   that right.  He doesn't have a right to testify falsely, and he

22   did that on, as I say, at least three separate occasions, and

23   I'll identify them for the record and for appellate purposes.

24   I'll give the Government an opportunity to respond as well

25   because there may be others and I know that they've submitted

1   the transcript and that's been admitted into evidence and we can

2   go by line and page number.

3        But generally speaking, I believe that the defendant

4   lied when he testified about the signing of the consent form,

5   and that was specifically contradicted by the Government's

6   witnesses.  He lied in the context of claiming that he was

7   threatened and coerced --

8        THE DEFENDANT:  I did not lie, sir.  That's not true.

9   They did coerce me and they threatened me at my house.  The

10  Government --

11       MR. SCHWARTZ:  Patrick --

12       THE COURT:  -- when he claimed that they threatened and

13  coerced him to give a confession outside in the patio and he

14  lied and he obstructed justice when he destroyed evidence in

15  taking the Kik application off his phone at that period of time

16  when he went back and was outside the presence of the agents for

17  a period of time.  But we can hear from the Government.  The

18  Government can give the line and page as to each of those and

19  whatever other ones they want to rely on.

20       MR. WIDLANSKI:  Yes, Your Honor, the ones Your Honor

21  identified, the Government would add to it our submissions on

22  the record.  That is our response to the defendant's objections.

23  So I won't reiterate that.  They are filed.  They are part of

24  the record already.  I believe Your Honor has seen them.

25       I would also just note, Your Honor, that the defendant

1  also did testify at the suppression hearing in front of Judge

2  McAliley and similarly raised these issues there as well.  Those

3  would be independent bases for the obstruction enhancement as

4  well.

5          THE COURT:  Mr. Schwartz, not to belabor this point,

6  but the Government has provided transcripts and has highlighted

7  in yellow those questions and answers I believe that they're

8  relying on.

9          Did you get a copy of their highlighted transcript?

10          MR. SCHWARTZ:  I did, Judge.

11          THE COURT:  So do we need to go beyond those or read

12  them into the record?  Are you satisfied?

13          MR. SCHWARTZ:  I'm satisfied that what the Government

14  underlined occurred at the trial and that was the testimony.

15          THE COURT:  Right.

16          MR. SCHWARTZ:  My disagreement -- and forgive me.  I

17  shouldn't argue once Your Honor --

18          THE COURT:  No, I mean, I understand what you're

19  saying.  There's a conclusion to be drawn from that.

20          MR. SCHWARTZ:  Right.  The jury found him not guilty of

21  destroying evidence.  I understand the standard is different at

22  this proceeding, and there was different evidence from different

23  witnesses.  Your Honor is the finder of fact and can make a

24  conclusion, but I would suggest to the Court that there was

25  equally as strong evidence that it occurred the way the Killens

1    suggested as it occurred the way the agents suggested it.

2         THE COURT:  And I understand your point.  We'll

3    continue the discussion, but with the exception of the

4    obstruction count, to reach any other conclusion would be

5    inconsistent with the jury's verdict that was on the standard of

6    beyond a reasonable doubt.  So, I mean, they had an opportunity

7    to hear his testimony and were they to believe him, they would

8    not have returned verdicts of guilty.

9         MR. SCHWARTZ:  Except that there was no charge or

10   instruction regarding suppression of evidence and the Fourth,

11   Fifth and Sixth Amendment because the magistrate had previously

12   ruled in the suppression hearing.  So I suggest that that issue

13   wasn't before the jury on the question of the illegal search and

14   seizure.  There was some evidence introduced at trial about it,

15   but it wasn't crystallized before the jury for them to make a

16   determination on it.

17        THE COURT:  It was properly not before the jury because

18   it was a question of law.  They were not to decide that in any

19   event.

20        MR. SCHWARTZ:  I'm not arguing with Your Honor.  I

21   agree, but we can't then say the jury verdict would be

22   inconsistent with that determination.

23        THE COURT:  Does the Government want to respond?

24        MR. WIDLANSKI:  If Your Honor would like me to respond

25   to that last point.

1          THE COURT:   The jury did return a verdict beyond a

2     reasonable doubt.   That's what's inconsistent with the

3     testimony.

4          MR. WIDLANSKI:   And Your Honor, that's exactly right.

5     Even one instance of -- I mean, the defendant spoke with

6     Mr. Schwartz on direct examination.   He spoke with me on

7     cross-examination, and repeatedly, he over and over and over

8     said that the pictures were not taken for sexual gratification.

9     That was the defense's entire argument, was that these pictures

10    were not lewd and lascivious.   The defendant said over and over

11    and over they were not taken for the purpose of sexual

12    gratification.   The jury returned a verdict inconsistent with

13    that.   Therefore, he must have been found, the jury believed, to

14    be untruthful.   That one instance repeated many, many times

15    throughout the course of his testimony would be sufficient to

16    find the obstruction enhancement regardless of all those other

17    things that Your Honor identified, that we identified in our

18    pleadings, which did materially impact the trial or it could

19    have materially impacted the trial because a separate yet equal

20    defense theory of the case was that this was a sort of

21    fraudulent investigation by the FBI, an investigation that was

22    sloppily done, that was forced and coerced by the agents from

23    Mr. Killen.   So casting the agents in this terrible, horrible

24    light absolutely had a material or could have had a material

25    impact on the jury.

1    So Your Honor, as Your Honor noted, I do and the

2    Government does believe that any other finding other than

3    obstruction would be inconsistent.

4    THE COURT:  Do you have any other evidence other than

5    the excerpts from the transcript that you've submitted that you

6    want to include in the record for appellate purposes?  I mean,

7    I'm not suggesting you need to because there is plenty there,

8    but --

9    MR. WIDLANSKI:  Your Honor, I believe the transcript

10   speaks for itself.

11   THE COURT:  Okay.  All right.  So we'll note the

12   objection and deny it with respect to the obstruction objection.

13   Next objection.

14   MR. SCHWARTZ:  I don't think, as I understand the

15   guidelines, that I can then raise the acceptance of

16   responsibility objection.

17   THE COURT:  Right.  But you have raised it and I think

18   you preserved it for the record just in the event that I turn

19   out to be wrong, but we'll note the objection to the denial of

20   acceptance of responsibility and deny the objection.

21   Next objection.

22   MR. SCHWARTZ:  I think those are the objections that I

23   raised, Your Honor.

24   THE COURT:  Okay.  So if there are no other objections,

25   the probation office has calculated a guideline range of 274

1    years, the total offense level of 43 and a Criminal History

2    Category of 1.  Is that a correct calculation of the guidelines

3    base on those rulings?

4         MR. SCHWARTZ:  Based on your rulings, 43 is correct and

5    one is correct.  Obviously, that's not conceding, with all

6    respect, Judge, that your rulings are correct.

7         THE COURT:  Okay.

8         MR. EMERY:  The Government agrees, Your Honor.

9         THE COURT:  So we've taken care of the calculation of

10   the guidelines.  The next thing we need to do is for me to

11   address Mr. Killen personally and ask him if there's anything he

12   wants to say on his own behalf.

13        MR. EMERY:  I'm sorry, Your Honor.  We do have a couple

14   of victims who would like to address the Court at some point.

15        THE COURT:  Sure.

16        MR. EMERY:  I also have Government's 3S, 4S and 5S that

17   we'd like to move into the record I understand without

18   objection.

19        THE COURT:  Okay.  They'll be admitted.  We're back to

20   Mr. Killen.

21        MR. EMERY:  Okay.  Thank you, Your Honor.

22      (Government's Exhibit Numbers 3S, 4S and 5S were received in

23   evidence.)

24        THE COURT:  Do you want to say anything, Mr. Killen?

25        MR. SCHWARTZ:  Your Honor, Mr. Killen has asked if Your

1   Honor would defer his statement until after his parents have

2   addressed the Court.

3           THE COURT:  Okay.

4           MR. SCHWARTZ:  Thank you, Your Honor.

5           I call on Patrick Killen, Sr. or --

6           THE COURTROOM DEPUTY:  Raise your right hand, please.

7               KAREN KILLEN, DEFENSE WITNESS, SWORN.

8           MS. KILLEN:  Absolutely.

9           THE COURTROOM DEPUTY:  Thank you.  Please state your

10  full name for the record.

11          MS. KILLEN:  Karen Lenore Killen, K-i-l-l-e-n.

12          THE COURTROOM DEPUTY:  Thank you.

13          THE COURT:  Go ahead.  Yes, ma'am, do you want to say

14  anything?

15          MS. KILLEN:  What am I supposed to do?  You're not

16  asking me questions?

17          MR. SCHWARTZ:  Just tell the Judge what you want to

18  say.

19          MS. KILLEN:  Okay.  I've been instructed to beg the

20  Court's mercy to please forgive my son.  Your Honor, I have a

21  14-year-old minor daughter at home.  I would do anything to

22  protect her.  I will never in a million years put her in harm's

23  way.  I'm begging you to let my son come home.  He is not a

24  pedophile.

25          My son also has nephrotic syndrome.  He loses protein

1    from his kidneys.  Prior to him being incarcerated, he was being

2    seen by a qualified specialist, and nephrologist every three

3    months.  He has not been seen by a qualified nephrologist since

4    March.  There's a strong possibility, Your Honor, that he could

5    die of kidney failure.  I'm begging you to please -- I'm begging

6    the Court's mercy to please let him come home.  He is not a

7    pedophile.  I would never put my daughter in harm's way.  My son

8    is a special needs kid.  Therefore, he acts very immature.

9         He was admitted to high school through the special

10   needs program, and after two years, he couldn't handle it, so I

11   had to pull him from the special needs program and home school

12   him myself.

13        Your Honor, are you paying attention to me?

14        THE COURT:  I am.

15        MS. KILLEN:  You're not looking at me.

16        THE COURT:  I'm taking notes.

17        MS. KILLEN:  Thank you, sir.

18        My son was bullied in both middle school and high

19   school, and I think as a result, he did some really stupid

20   things, but he is not a pedophile.  Again, I would never put my

21   daughter in harm's way.

22        I forgot what I wanted to say.  No, there's something

23   else I needed to say.  I can't remember.  I'm so sorry.

24        THE COURT:  Take your time.

25        MS. KILLEN:  With regard to perjury, I would never

1  perjure myself.  And even in the FBI's own 302 document, it

2  clearly states that they seized the equipment and then he signed

3  the consent.

4        He is truly special needs.  He doesn't deserve this.

5        I'm sorry.  There's something so important I wanted to

6  say.  I just can't remember it.  I don't know.  I can't

7  remember.  It was something.  I can't remember.  It was so

8  important.

9        My son has always attended Christian schools.  He

10 believes in God.  He always follows The Ten Commandments.

11 According to the Superseding Indictment, he was doing this in

12 the fall of 2013.  I was diagnosed with breast cancer in the

13 fall of 2013.  He thought I was going to die.  I think what he

14 did was stupid, but I think it was only his way, an immature

15 way, a very immature and special needs -- immature way of trying

16 to control his environment.  He's not what they say he is.

17       Please, Your Honor, I am begging you, please, let him

18 come home, please.  Please don't do this to him.  I'm begging

19 you.  I'm begging the Court's mercy.  Please.  Thank you.

20       THE COURT:  Thank you.

21       THE COURTROOM DEPUTY:  Raise your right hand, please.

22       PATRICK KILLEN, SR., DEFENSE WITNESS, SWORN.

23       THE COURTROOM DEPUTY:  Thank you.  Please state your

24 full name for the record.

25       MR. KILLEN, SR:  Patrick John Killen, Sr.

1          THE COURTROOM DEPUTY:  Thank you.

2          THE COURT:  Yes, sir.

3          MR. KILLEN, SR:  Excuse me, sir.  I have a -- I just

4    need to compose myself for a moment.

5          There are a lot of different issues that have occurred

6    in this event.  I know Patrick is truly sorry for what he has

7    done.  I know that Karen and I will support him and resolve his

8    needs.  We want him to become an asset to society, not a burden

9    to it.  I too am glad that he stopped the activities that he was

10   doing a few months before he was arrested, not the month before

11   as has been stated.

12         He needs help.  He does not -- he did something wrong

13   and needs to pay dues, whatever that is.  He's got to pay a

14   price, but there is some background explanations.

15         What has been sort of downplayed is Patrick is a

16   special needs child.  He has attention deficit disorder.  He's

17   emotionally immature, placing him in an age group more like 15

18   or 16 at the time these events took place.  However, I am very

19   proud of Patrick for all that he has overcome in his life.  The

20   short life that he has had has had major, major obstacles.  Even

21   the magistrate judge confirmed that Patrick was immature in her

22   statements.

23         Patrick never used or produced or created those videos.

24   They were pushed to him.  Patrick is young and will never do it

25   again.  There's no question about it.

Several times the prosecutor has stated his danger to society.  There are experts in the field that show something very different, about the future of Patrick not being a danger to society.  Articles from Dr. Steven Glasgow, Dr. Fred Berlin, Dr. Michael Seto, Dr. Kelly Babchishin; Fred Berlin from Johns Hopkins University School of Medicine, and Denise Sawyer of the National Institute for the Study, Prevention and Treatment of Sexual Trauma, collectively imply, those who may simply be naive and harmlessly curious, some who are themselves quite vulnerable, persons convicted of child pornography offering are low risk to contact offerings that are already identified contact offerings.  He is extremely low risk.

The prosecutor has also said danger to society because he was active just before the arrest, which isn't true.  He wasn't active before the arrest.  Patrick told the truth.  We told the truth.  I handled the ethics for 35,000 real estate agents.  My son will tell the truth.  He may have mistakenly in the beginning not told the truth, but at his age that's what they do.

We need to do what's best for Patrick.  Patrick fits into a population in the United States where 68 percent of all teenagers are on the Internet with sexual activity.  He's only a small part of that.  He is a special needs young adult.  His maturity level, his age maturity level is not where he is mature.  His misconduct was a function of his immaturity, not

1   his intent to do harm.  I'm not excusing him.  I hold high

2   standards, but the punishment just is way out of line with what

3   he really needs.  The experts tell us he needs counseling.

4   Yeah, maybe a little bit of prison time just to teach him a

5   lesson, but he needs counseling and he can be an active part of

6   our society.

7          The Government can't stop the growing problem that's

8   putting everyone in jail.  You can't fill up all the jails with

9   pedophiles.  You need to help them.  You need to address these

10  issues that are being done by these doctors, not by the

11  prosecutors, not by the FBI.  We have to find a new way.

12         Patrick should not be another burden to society.  We

13  can fix this.  We need the opportunity.  He will be a good

14  citizen.

15         Thank you.

16         MR. SCHWARTZ:  Also, Patrick's next door neighbor asks

17  if he could come and take two minutes of the Court's time.

18         THE COURT:  All right.

19         THE COURTROOM DEPUTY:  Raise your right hand, please.

20            GERALD FUSCO, DEFENSE WITNESS, SWORN.

21         THE COURTROOM DEPUTY:  Thank you.  Please, state your

22  full name for the report.

23         MR. FUSCO:  My name is Gerald Fusco, F-u-s-c-o.

24         THE COURTROOM DEPUTY:  Thank you.

25         MR. FUSCO:  I'm here on my own.  I see the situation

1   that's evolved here.  I've lived next to Pat for about 30 years,

2   and I've known his whole family very well.  I know Patrick since

3   he was a baby, I mean, since he was three when he came to this

4   country.  He came from a very rough beginning in which touch is

5   denied, and it has a permanent effect on people.  I find very

6   hard to believe that he would be involved in such things.

7   However, we live in a different world than probably all of us

8   here grew up in.

9       The kids today don't take the same -- they don't take

10  it with the same seriousness that we were all raised with.  As

11  Pat was saying, mostly almost every teenager thinks it's a joke

12  to send pictures of themselves around.

13      Patrick has always -- he's had trouble identifying with

14  other teenagers.  He's been withdrawn.  I know that he had to

15  have special schooling.  He's always been special needs.  I knew

16  that all along.  I never wanted to, you know, confront him with

17  that, but he was never able to look me straight in the eye and I

18  knew immediately what he was suffering from.

19      I can only ask that you take into account his

20  background and the fact that he is someone who -- excuse me one

21  second.  He's a good person who made a bad mistake, and I really

22  hope that you guys can find it in your heart to treat him with a

23  little leniency.

24      Thank you very much.

25      THE COURT:  Thank you.

1              Okay.  Can we have the defendant sworn in, please?

2              MR. SCHWARTZ:  I'm sorry, Your Honor?

3              THE COURT:  Can we have the defendant sworn in?

4              THE COURTROOM DEPUTY:  Raise your right hand, please.

5         (The defendant was sworn in by the courtroom deputy.)

6              THE COURTROOM DEPUTY:   Thank you.  Please state your

7    full name for the record.

8              THE DEFENDANT:  Patrick Killen.

9              THE COURTROOM DEPUTY:  Thank you.

10             THE DEFENDANT:  Killen, K-i-l-l-e-n.

11             Sir, I wanted to read you a copy of the victim's

12   reports which the prosecutor I assume is going to read to you as

13   well, but the point of these reports is to show the fallacy and

14   the dishonest and mixed or sordid views placed on these victims

15   and also the Court.

16             In one letter from the victim, which I don't know who

17        the victim is or who wrote it, but it says, "To the

18        Honorable K. Michael Moore:  I'm the mother of the victim

19        and would like to make a statement on my behalf of my son.

20        I am speaking for all abused and molested children.  Our

21        children's innocence is being taken away by sexual predators

22        and child abusers every day."

23             Sir, the victim in this -- actually, the parent that

24   wrote this letter obviously does not know this case.  It's a

25   mixed review of nothing that even happened during this trial.  I

1  never abused.  I never molested, nor would I ever lure any child

2  away to do that.  So I ask that this victim's report not even be

3  considered, because obviously, they don't know anything about

4  this trial.

5         In addition, there's another victim.  I'm assuming it's

6       Garrett Foster's parents.  It says:  "Dear Honorable Judge

7       Moore:"  And I'm reading excerpts of these reports, of

8       course.  It says on the second page of the victim's report,

9       "I also wanted to share with you that as we have been

10      alongside of Garrett every step of the way ... one of the

11      most significant moments for me was in the courtroom seeing

12      Patrick Killen, Jr. without family and alienated."

13         Sir, my father sat outside the courtroom the whole

14  time.  Obviously, the parent does not know what happened in the

15  courtroom the whole time and, therefore, made an inaccurate

16  point of view, which goes to my point that with the victims'

17  parents, with the victims and supposed victims, and the

18  prosecutor and this whole court system, they have it all wrong.

19  I am not what you people think I am.

20         I know what I want to talk about.

21         Sir, in addition to being partial mixed truths, I never

22  lied about what happened on February 11, 2014.  Even though you

23  state I lied, you were incorrect.  Just like as you are here for

24  justice, I am here for justice as well, and I am here for

25  justice that Schwartzenberger and Ginther will never go to

1  another person's house again and threaten them, just like in

2  similar that I may have threatened these victims as well.

3          What I did when this first happened was -- I was a 19

4  to 20-year-old.  I started when I was 19 and I was a stupid,

5  immature teenage boy that did not feel secure with myself, so I

6  did what was said during the trial.  I did Kik boys and asked

7  them for photographs, but not in the sense as truth or mixed for

8  sexual gratification.  I was not right with what I did, and I

9  will never do it again if given a second chance.

10          I don't understand how I could be put away for life for

11  actions that I did before I could even drink, before the age of

12  21.  If children, as they say, are not able to drink under the

13  age of 21, how could I be knowingly and willfully doing these

14  acts and understand everything that I did under the age of 21 as

15  well?

16          I would like to finish with, that I have no interest in

17  boys.  I very much like women and I hope to have a relationship

18  with a woman and that I am very sorry for what I did and that I

19  will not do it again.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. SCHWARTZ:  May I be heard, Your Honor?

23          THE COURT:  Sure.

24          MR. SCHWARTZ:  Your Honor, the defendant has been

25  convicted obviously of serious crimes.  There are other people

in this district who have been convicted or committed similar
crimes who have gotten significantly lesser sentences.  We've
cited a number of cases to Your Honor in our sentencing
memorandum where judges in this court have sentenced defendants
to single-digit years in prison for very similar crimes.

I would also cite to Your Honor something that was in
last Friday's newspaper.  I have the Sun Sentinel.  A former
courtroom deputy gets eight years in a child pornography case.
There a deputy had been videotaping boys in the shower,
masturbating and doing other things, kept and utilized those
videos.  This was an adult, not with maturity problems or
anything of that sort.  He, as a matter of fact, I believe, was
applying to be a treasury agent when he took a lie detector
test, asked if he had ever committed a crime.  It showed that he
was lying, and they asked him about it and he admitted to this
crime.

His attorney went to the Government before the arrest,
after the agents visited him, but before he was arrested and
indicted, and worked out an agreement whereby he took a plea.
They didn't charge him with manufacturing, although that's what
he did.  They charged him with possession on an Information, and
with agreement with the Government, there was therefore no
mandatory 15-year minimum sentence, and Judge Dimitrouleas, I
believe, last Friday gave him eight years in jail.  That was an
adult who actually could interact with the boy because they were

1  present at the same premise and a law enforcement officer at

2  that.

3         In our sentencing memorandum, we talked about the fact

4  that the sentences for this crime are sentences that were not

5  adduced in the normal way that the Sentencing Commission reaches

6  suggested sentences, suggested guidelines under the current law.

7  As a matter of fact, the Sentencing Commission wanted the

8  guidelines to be less.  For political reasons, Congress required

9  guidelines be high, and the guidelines don't really reflect the

10 nature and the extent of the crime.

11        If Patrick Killen had committed a murder, it's unlikely

12 he would have gotten three life sentences.  In many parts of the

13 state and many parts of the country, he wouldn't have gotten

14 life.  If he was an amputee sprinter, he might have served a

15 year and a half in jail for murder or for manslaughter.  If

16 Patrick Killen had committed rape or a number of rapes, he

17 wouldn't be facing three lives in prison.

18        Armed robberies, crimes where there were actual

19 physical damage to victims, he wouldn't be facing this sentence.

20        But we have a young boy -- you know, I call him a young

21 boy because you can see by his behavior in the courtroom, he's

22 not a mature man.  He's somebody who's facing Your Honor

23 sentencing him to possible life imprisonment and still he's

24 arguing with Your Honor and being rude to Your Honor.  I didn't

25 instruct him to do that, Judge, but it illustrates his maturity,

1    his lack of social development, the special needs nature that

2    his parents were talking about when they came before Your Honor.

3              Does he need significant help?  Yes.  Should he be

4    punished for what he did?  Yes.  Did he threaten a number of

5    boys that he would expose them on the Internet if they didn't

6    send him more pictures?  Yes.  Did he ever do that?  No.  He

7    didn't post these boys' pictures on the Internet.  On a couple

8    of occasions, he provided pictures from his file to a gentleman

9    in Germany who was -- at some point, we don't know quite when.

10   It's a gentleman from Germany who was cooperating with the

11   Italian police.

12             He should receive, again, a significant sentence, but

13   life imprisonment I suggest to the Court is inappropriate.

14   Thirty years would be inappropriate.  On 30 years, he would do

15   about 25 years in jail, probably 26 years in jail.  He would be

16   close to 50 when he finally came out.

17             If Your Honor were to give him the mandatory minimum

18   sentence, and I think that's all Your Honor can do in these,

19   that's the least Your Honor can give in these circumstances, I

20   still suggest that that would be too much.  But if Your Honor

21   were to give him that, he would serve the next 12 and a half

22   years in jail and be in his mid 30s when he came back after

23   spending a number of years receiving counseling, not on how to

24   improve his morals at the age of 70, but counseling from

25   significant counselors who are familiar with his problems in the

1  institution. I would suggest that that is the sentence that's

2  appropriate here, a 15-year sentence, the mandatory minimum.

3  Judge, there's been some dispute. Did Patrick get

4  sexual gratification from seeing these pictures? He's told me,

5  he's told the Court, he told the jury that he didn't. If the

6  jury found the pictures were sexually gratifying -- were the

7  type that were sexually gratifying, that's a jury decision. I

8  can't dispute that, but that doesn't mean Patrick was lying when

9  he said that he looked at these pictures for curiosity. He

10  asked for the pictures because he felt isolated and he wanted to

11  connect with people.

12  You've heard during the trial that he had -- until the

13  last six or seven months before he was arrested when he went to

14  Keiser College and he had a job that was interesting, he had no

15  real contact with other people. He had no friends. He was

16  isolated in a room and this was his method of getting contact

17  and asserting his ego, getting people to do what he wanted. It

18  was wrong.

19  The penalty that Congress puts for cyberbullying of

20  this sort, for threatening over the Internet is five years.

21  There were two counts of that. I suggested to the jury they

22  convicted him of that and they disagreed with me, obviously.

23  But I ask Your Honor to seriously consider sentencing

24  below the guideline range based first on Patrick's social

25  history, where he came to this country past the age of three

1    after being tied to a crib in a Romanian orphanage for his

2    formative years.  The health problems he had, the problems he

3    had in school, all of his concerns growing up over the years,

4    take those into account.  Sentence him below the guideline range

5    and allow him to have the opportunity to be rehabilitated, which

6    is one of the reasons for our prison system or used to be, to

7    get psychological counseling and come back to his parents while

8    hopefully they are still alive.  His dad is 73.  His mom is

9    turning 60.

10          The other thing that I'll ask the Court is this:

11   Obviously, although I think Richard Klugh is afraid to come into

12   the courtroom, we are going to appeal the decision in the case.

13   His appellate attorney needs an opportunity to talk with him and

14   question him and work with him during the course of the appeal.

15   Whatever Your Honor sentences him to, I'd ask that you allow him

16   to stay at the Federal Detention Center until the time the

17   appeal is completed so he has an opportunity to work with his

18   appellate attorney on the appeal.  And I thank Your Honor.

19          THE COURT:  Thank you.  Anything from the Government?

20          MR. WIDLANSKI:  Yes, Your Honor.  At this time the

21   Government would call Jeffrey Eckert.

22          And Your Honor, as a little background, Mr. Eckert was

23   the parent who had the courage to report this to the FBI in

24   Charlotte and he's really the reason why we're here today and

25   the defendant is no longer producing child pornography.

1          THE COURTROOM DEPUTY:  Raise your right hand, please.

2          JEFFREY ECKERT, GOVERNMENT'S WITNESS, SWORN.

3          THE COURTROOM DEPUTY:  Thank you.  Please state your

4   full name for the record.

5          MR. ECKERT:  Jeffrey Eckert.

6          MR. SCHWARTZ:  Your Honor, I would object to Mr. Eckert

7   testifying in that he's part of a group that is going to or

8   trying to sue Kik for civil damages regarding this incident and

9   other incidents with Kik and I think that would discredit his

10  testimony to some extent.

11         THE COURT:  Well, you can cross-examine him on that.

12         THE COURTROOM DEPUTY:  Mr. Eckert, would you please

13  spell your last name for the record?

14         MR. ECKERT:  E-c-k-e-r-t.

15         THE COURTROOM DEPUTY:  Thank you.

16         MR. ECKERT:  I don't have anything prepared.  This is a

17  terrible situation.  There's no victory.  You know, there's no

18  victory in this for me.  I'm a parent of five kids.  Man, I just

19  -- Mr. and Mrs. Killen, I just -- I don't know how -- it's

20  horrible.  It's horrible, horrible.  I feel terrible for them.

21  But, you know, Patrick, it's been some time since we've

22  communicated, but when we did, I told you that I would find you

23  and that I would make sure that you went to prison.  And as a

24  parent, just like you have seen your parents go to great lengths

25  and depths to protect their child, I did the same thing.  So

1    that's my son.  You had no right to take advantage of my son.

2    None.  You blasted his picture out into the Internet.  All

3    right.  You had to be held accountable.

4         So in advance of his attorney's questions about Kik, my

5    goal in that is -- there is no liability on Kik's part.  My goal

6    is exactly as it was with Patrick, was that to hold everybody

7    accountable that took advantage of my son.  You don't get to do

8    that to my son.

9         So I welcome your questions, Mr. Schwartz.

10        MR. SCHWARTZ:  Thank you.

11        I just wonder, when did he post your son's picture on

12   the Internet?

13        MR. ECKERT:  It's been told to me that it's been

14   posted.

15        MR. SCHWARTZ:  Have you seen it?

16        MR. ECKERT:  No.

17        MR. SCHWARTZ:  Do you have any evidence that he ever

18   posted it on the Internet?

19        MR. ECKERT:  I do not.

20        MR. SCHWARTZ:  Who told you?

21        MR. ECKERT:  It's my understanding that it's been

22   posted on the Internet.

23        MR. SCHWARTZ:  Who told you?  Who told you?

24        MR. ECKERT:  I believe that it's been posted on the

25   Internet.

1        MR. SCHWARTZ:  But you said you were told.  Who told

2   you?

3        MR. ECKERT:  I don't remember.  Someone in the process

4   told me that.

5        But your response, Patrick, when I told you I would

6   find you, which I think is noteworthy --

7        MR. SCHWARTZ:  I think it's my opportunity to question,

8   Your Honor.

9        THE COURT:  Go ahead.

10       MR. SCHWARTZ:  Are you bringing a lawsuit against Kik?

11       MR. ECKERT:  No.

12       MR. SCHWARTZ:  Did you say you were?

13       MR. ECKERT:  As I said, the reasoning behind that was

14   to hold everyone accountable that took advantage of my son.

15       MR. SCHWARTZ:  I have no questions anymore, Judge.

16       MR. WIDLANSKI:  Your Honor, one follow-up.

17       THE COURT:  All right.

18       MR. WIDLANSKI:  Mr. Eckert, you said that Patrick

19   Killen had a response to you when you had an exchange with him?

20       MR. ECKERT:  That's right.  His response was maniacally

21   sending back L-o-l-o-l-o-l and then firing back pictures naked

22   of my son, repeatedly.

23       MR. WIDLANSKI:  No further questions, Your Honor.

24       THE COURT:  Thank you.

25       MR. EMERY:  Your Honor, we have next Ms. Valerie

1   Carter.  She's actually the mother who wrote the victim impact

2   statement in Government 5S.  She would like to address the

3   Court.

4          THE COURTROOM DEPUTY:  Raise your right hand, please.

5          VALERIE CARTER, GOVERNMENT'S WITNESS, SWORN.

6          THE COURTROOM DEPUTY:  Thank you.  Please state your

7   full name for the record.

8          MS. CARTER:  Valerie Carter.

9          THE COURTROOM DEPUTY:  And spell it, too?

10         MS. CARTER:  V-a-l-e-r-i-e.  Carter, C-a-r-t-e-r.

11         THE COURTROOM DEPUTY:  Thank you very much.

12         MS. CARTER:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.

14         MS. CARTER:  This is the hardest thing that I've ever

15   had to do.  I'm also a mother of five.  My oldest son just

16   turned 22 on Monday.  When I heard this woman and her husband,

17   it broke my heart, but my son is 17.  At the time he was 15, 16.

18   If it wasn't for these agents, and I commend them, I would have

19   never known.  He's embarrassed.  He doesn't talk to me about it,

20   but he's going to be okay.  Just to think that children are

21   being taken advantage of, because I have little ones, is

22   hurtful.  It's scary.  It's very scary.  I'm nervous.

23         Anyone that hurts a child or tries to take their

24   innocence in any way, Internet, physically, it's wrong.  It's

25   just wrong.

1    I don't know.  I pray for you.  I hope you get the help

2  that you need, I really do, because to me you're a child, too.

3  But that gives you no right to take advantage of children.

4  None.  That's all I have to say.

5          THE COURT:  Thank you.

6          MR. EMERY:  Your Honor, the Government filed its

7  response to the defendant's request for a variance in this case.

8  The Government is asking for a guideline sentence in this case

9  of 274 years, Your Honor.  And why is that?  Well, the

10  defendant, Patrick Killen, Jr., sexually abused 288 children.

11  Your Honor, that was one of the purposes of why the Government

12  introduced Government's 2S, the chart, to show the magnitude of

13  the defendant's scheme.  And Your Honor, that number is a very

14  conservative number.  Other videos of masturbation were also

15  found on the defendant's computer.  However, those are not

16  captured in that 288 number.

17          Your Honor, it used to be that when a parent was with

18  their child in the house, that their child was safe.  However,

19  and unfortunately, the Internet gives pedophiles like Patrick

20  Killen, Jr. a key in a way inside of that house.

21          If Your Honor recalls with some of the facts that the

22  Government introduced, one of the boys, J.C., one of the charged

23  victims, in that chat, while the defendant is extorting him and

24  obtaining naked pictures of him, he says, wait a minute.  My mom

25  is yelling at me.  I have to go.  Unfortunately, Your Honor, the

1    Internet has changed that and the defendant took advantage of

2    that situation.

3            It's just not the 288 victims that he sexually abused.

4    Let's think about and remember how he did that, Your Honor.

5    This wasn't just about sexual curiosity.  Not at all.  If you

6    just look at the defendant's chats, he called the boys "his

7    boys."  He called them "hot."  He preferred boys of the ages 12

8    to 14.  That was anything far from sexual curiosity.

9            The defendant created an elaborate scheme to trick and

10   induce these boys.  He pretended to be a 14-year-old female

11   cheerleader.  He created fake social media pages in order to

12   trick those boys.  He created the Facebook website in the name

13   of Chanel Izzabel.  He created the Instagram pages in the name

14   of Chanel Izzabel.  He used a Kik username, RebeccaTill, also.

15   Your Honor, so I don't think there can be any dispute of how

16   extreme and far-reaching the defendant's scheme was, and it

17   continued for a long time.  At least as far as what the FBI can

18   tell, his scheme started in the fall of 2012 and went up to the

19   time that he was arrested in March of 2015.

20           Now, the defendant talked about, please, give him a

21   second chance.  Your Honor, he had that second chance.  When the

22   FBI came to his house in February of 2014, knocked on his door

23   and he confessed to what he did, to using Kik for getting at

24   least 50 images while he pretended to be a female.  Did that

25   stop the defendant?

1          THE DEFENDANT:  Yes.

2          MR. EMERY:  Not at all.  He escalated his conduct, Your

3    Honor, and we know that from the evidence that was introduced at

4    trial.

5          He moved from Kik to Skype.  And based on the contents

6    of the Skype chats and the Skype images and videos that were

7    found on his computer, he was producing those images.  He

8    tricked boys into sending him images and videos of themselves

9    masturbating.  He admitted that, Your Honor, in his direct

10   testimony.

11         THE DEFENDANT:  You're committing perjury.  You're

12   fucking lying.  I never produced any of those.  You're

13   committing perjury right now.  Those are from --

14         MR. EMERY:  So, Your Honor, again, I just want to talk

15   a little bit about the 3553(a) factors.  I've touched on some of

16   them already.  But one of the things as far as a deterrent

17   effect is specific deterrence.

18         Has the defendant shown any sort of remorse for what he

19   did?

20         THE DEFENDANT:  Yes.

21         MR. EMERY:  Your Honor, the answer to that is no.

22         THE DEFENDANT:  How can you say that?

23         MR. SCHWARTZ:  Patrick --

24         THE DEFENDANT:  The guy is an idiot.

25         MR. EMERY:  He, himself, Your Honor, even to this day,

1   stood up here and attacked the victims.  He called them supposed

2   victims.

3          The defendant perjured himself on the stand, again,

4   demonstrating his lack of remorse.

5          Another reason for the 274-year sentence, Your Honor,

6   is general deterrence.  Again, the Government searched far and

7   wide in order to find a case of this magnitude and it was

8   hard-pressed to do so, a case involving 288 victims over the

9   time span that the defendant acted.

10          What the defendant did is commonly known as sextortion,

11   Your Honor.  It is a growing and evolving threat facing our

12   society today, and a sentence of 274 years will send a message

13   to those other pedophiles like the defendant that you cannot do

14   that to children.  You cannot use the Internet.  You cannot

15   sneak into people's homes where they think they're safe with

16   their children and victimize children.

17          And Your Honor, this is also not just about the

18   Internet.  There was one specific chat where the defendant was

19   bragging on GigaTribe about how he met, physically, he met a

20   boy, a 14-year-old boy at Disney and he got a naked picture of

21   that boy.

22          Lastly, Your Honor, the impact on the victims here

23   cannot be understated.  I'll just remind Your Honor of the

24   testimony of Tara Jo Frost and the picture that she saw of her

25   son, the picture that the defendant extorted from him to send to

1  him.  She said that picture -- in that picture my son is scared.

2  He is fearful.  And in that chat, Minor G.F. said to the

3  defendant, after the defendant threatened to post his picture,

4  the naked picture that he sent the defendant, he told the

5  defendant, "No, fine.  One more.  That's it.  I swear.  Please

6  don't.  You'll ruin my life."

7       Your Honor, I think it was clear also to show his lack

8  of remorse, the defendant, how he acted on the stand was

9  indicative of somebody who is a manipulator, Your Honor.  He is

10 far from special needs.  All we have to do is take a look at

11 that testimony, and I felt that we were there when he was

12 conversing with those boys.  How much of a manipulator he was on

13 the stand, we saw that in those chats with those boys, Your

14 Honor.

15      So in sum, Your Honor, the Government requests the 274

16 years because the defendant had his chance.  He didn't stop.

17 His conduct worsened.  It escalated.  He continued to harm

18 children.  Based on that, Your Honor, the Government requests

19 the guideline sentence.  Thank you.

20      THE COURT:  Thank you.  Anything else?

21      Mr. Schwartz, have we or do we need to go into any

22 further discussion regarding the 3553(a) factors?  I mean --

23      MR. SCHWARTZ:  I think we have spoken about them, Your

24 Honor.

25      THE COURT:  Okay.  So they include the nature and

1  circumstances of the instant offense.  I think that has been

2  well-documented.  We've discussed the history and

3  characteristics of the defendant, both during the course of the

4  offense conduct as well as his educational, emotional issues and

5  his issues in early childhood.

6          MR. SCHWARTZ:  And we stand by our submission to Your

7  Honor in writing on that.

8          THE COURT:  Okay.  A sentence is also to be imposed

9  that will promote respect for law and provide adequate

10  deterrence.  My only point on the deterrence factor is that in

11  this case the sentence to be imposed I think has to ensure that

12  there is both general deterrence from others who would consider

13  engaging in similar conduct as well as specific deterrence.  I'm

14  not convinced of anything other than a substantial period of

15  incarceration is going to deter this defendant from engaging in

16  similar conduct.  I think he's simply incapable of conforming

17  his conduct to the requirements of the law when it comes to

18  engaging in child pornography.

19          Also, to the extent that there have been guideline

20  calculations and determinations made, the Court would

21  alternatively impose a sentence otherwise outside the applicable

22  guideline range based on post Booker requirements that the

23  sentence imposed be a reasonable sentence.  And so to the extent

24  that there are any errors in the calculation of the guidelines,

25  the sentence would otherwise be identical as a reasonable

1    sentence post Booker.

2        The Court has considered the statements of all parties

3    -- and let me just make another couple of comments.  I certainly

4    respect the defendant's parents' expressions of love and

5    support.  It's commendable.  I know, Mr. Schwartz, you discussed

6    a number of other sentences that have been imposed elsewhere,

7    not only in this district, but in other countries and sentencing

8    disparity is not a recognized basis for a sentence to be

9    imposed.  Each of these sentences are tailored to the individual

10   and the circumstances are different.  In terms of whether

11   someone in the one case that you mentioned -- I think some

12   courtroom deputy that pled guilty and it was pursuant to a Plea

13   Agreement.  I'm not sufficiently familiar with the facts of that

14   case or what the circumstances were imposed by another judge

15   pursuant to an agreement between the parties, but suffice it to

16   say, in this case we have a defendant who was a serial abuser of

17   multiple victims.  He has repeatedly shown nothing in the way of

18   any remorse.  He was certainly entitled to exercise his right to

19   trial and not to have that be held against him.  Nobody has done

20   that.  He doesn't have a right to take the stand and lie, which

21   he did repeatedly.

22       I understand his dispute with the trial, with the jury,

23   with the outcome, with the Court, with opposing counsel, but I

24   am duty bound to impose a sentence in accordance with the jury's

25   verdict.

1          The Court has considered the statements of all parties,

2    the Presentence Report which contains the advisory guidelines

3    and the statutory factors as set forth in Title 18, United

4    States Code, Section 3553.  The Court will impose a sentence

5    that is sufficient, but not greater than necessary.  The

6    sentence will reflect the seriousness of the offenses, afford

7    adequate and general and specific deterrence that will protect

8    the public from further crimes from the defendant and promote

9    respect for the law.

10         It's the finding of the Court the defendant is not able

11   to pay a fine in addition to any mandatory restitution,

12   therefore, no fine will be imposed.  Restitution will be ordered

13   for January 7, 2016 at 2:00 p.m., and I'll order the U.S.

14   Attorney's Office to place a hold on the defendant so he remains

15   in the district for purposes of that hearing.  Hopefully

16   Mr. Schwartz will give appellate counsel an opportunity to meet

17   and discuss with his client any grounds for appeal.

18         It's the judgment of the Court the defendant, Patrick

19   Killen, is committed to the Bureau of Prisons to be imprisoned

20   for 1,668 months or 139 years.  The term consists of terms of

21   180 months as to each of Counts 1, 3 and 5, the terms of 60

22   months as to each of Counts 2, 7, 8, 9, 10 and 11; the terms of

23   24 months as to each of Counts 4 and 6; terms of 240 months as

24   to each of Counts 12 and 15; and terms of 120 months as to each

25   of Counts 13 and 16, all such terms to be served consecutively

1    to each other.

2         It's further ordered that pursuant to Title 18, United

3    States Code, Section 3664(d)(5), the victims' losses are not yet

4    ascertainable.  So we'll set the restitution hearing, as I said,

5    for January 7.

6         Upon release from imprisonment, the defendant shall be

7    placed on supervised release for life, consisting the terms of

8    life as to each of Counts 1, 2, 3, 5, 7, 8, 9, 10, 11, 12, 13,

9    15 and 16 and terms of one year as to each of Counts 4 and 6,

10   all such terms to run concurrently.

11        Within 72 hours of release from the custody of the

12   Bureau of Prisons, the defendant shall report in person to the

13   probation office in the district to which the defendant is

14   released.

15        While on supervised release, the defendant shall not

16   commit any crimes, shall be prohibited from possessing a firearm

17   or other dangerous device, shall not possess a controlled

18   substance, shall cooperate in the collection of DNA and shall

19   comply with the standard conditions of supervised release,

20   including the following special conditions:  It's further

21   ordered the defendant shall pay immediately to the United States

22   a special assessment of $100 as to each count for a total of

23   $1500.  Total sentence:  1,668 months imprisonment, restitution

24   to be determined, the supervised release for life and a $1500

25   special assessment.

1            Forfeiture of the defendant's right, title and interest

2    in certain property is hereby ordered.  The United States shall

3    submit a proposed Order of Forfeiture within three days of this

4    proceeding.

5            Now that sentence has been imposed, does the defendant

6    or his counsel object to the Court's finding of fact or to the

7    manner in which sentence was pronounced?  And I think the

8    probation officer wants to say something.

9            THE PROBATION OFFICER:  Your Honor, I omitted including

10   the conditions as Your Honor read them into the record.  So I

11   would just ask the Court to impose the conditions that are

12   mentioned in Part G of the report which are recommended special

13   conditions.

14           THE COURT:  Where is that?  What page?

15           THE PROBATION OFFICER:  Starting on Page 31.

16           THE COURT:  Okay.  So that includes paragraphs 164

17   through 174.  We'll include all of those special conditions

18   which include data encryption restriction, computer modem

19   restriction, computer possession restriction, employer computer

20   restriction disclosure, no contact with minors, no contact with

21   minors at employment, no involvement in youth organizations, sex

22   offender treatment, restricted from possession of sexual

23   materials, Adam Walsh Act, search conditions and sex offender

24   registration.  Include that in the judgment as well.

25           THE PROBATION OFFICER:  In addition, Your Honor,

1   there's a financial disclosure requirement that we also

2   recommend for the restitution.

3          THE COURT:  Okay.  We'll incorporate paragraph 175 as

4   well.  The defendant shall provide complete access to financial

5   information including disclosure of all business and personal

6   finances to the U.S. probation officer.

7          Let's see.  Mr. Schwartz?

8          MR. SCHWARTZ:  I have no objection, other than my

9   objections previously made, no objection to the calculations or

10  the manner in which you imposed sentence.  And I would just ask

11  Your Honor for the purpose of appeal and going forward, I'm not

12  sure exactly what the computer restrictions mean, but I ask that

13  the defendant be allowed to continue to have contact with his

14  parents and his attorney over the CorrLinks system, which is the

15  email system in prison.  They monitor that.  It's restricted to

16  people that are approved.

17         THE PROBATION OFFICER:  Your Honor, if I may, that

18  condition applies as to supervised release.  So it will be a

19  post-release condition.

20         MR. SCHWARTZ:  Thank you.

21         THE COURT:  Okay.  All right.  Mr. Killen, do you

22  understand you have a right to appeal the sentence imposed?

23         MR. SCHWARTZ:  Yes, he understands, Your Honor.

24         THE COURT:  Okay.

25         MR. SCHWARTZ:  He has been declared indigent for costs

1  by Your Honor during the course of the trial.  His father is

2  continuing to struggle to retain an appellate counsel for him

3  and will do that, but I ask Your Honor rule that for the

4  purposes of appeal, he continue to be indigent for costs.

5              THE COURT:  Okay.  So ordered.

6              MR. EMERY:  And Your Honor, the Government has already

7  filed a preliminary Order of Forfeiture in Docket Entry 120,

8  which Your Honor granted, Docket Entry 122.  So we would just

9  ask the forfeiture be incorporated by reference into the J&C.

10             THE COURT:  All right.  So ordered.

11             Anything else?

12             And you didn't request a designation, did you?  South

13 Florida?

14             MR. SCHWARTZ:  I would request a designation of South

15 Florida.  I don't know how effective that would be.

16             THE COURT:  But we'll include it in the J&C.

17             MR. SCHWARTZ:  Okay.  And I would ask for the right, if

18 Your Honor doesn't object, to come back if Mr. Klugh, as his

19 appellate counsel, feels that he continues to need him past that

20 date in January.

21             THE COURT:  You can file a motion.  I mean, the Bureau

22 of Prisons has their own methods for determining designation.

23 We can recommend it.  It's not binding on them.  They're going

24 to do what they think is in their own security interest and his

25 classification.

1        MR. SCHWARTZ:  Thank you, Your Honor.

2        THE COURT:  Okay.  Thank you.

3        MR. EMERY:  Thank you, Your Honor.

4        MR. WIDLANSKI:  Thank you, Your Honor.

5        THE COURTROOM DEPUTY:  All rise.  Court is adjourned.

6        (The hearing was concluded at 4:40 p.m.)

7

8              C E R T I F I C A T E

9        I hereby certify that the foregoing is an accurate

10   transcription of proceedings in the above-entitled matter.

11

12   ___02-11-16_____        _____
          DATE                 GILDA PASTOR-HERNANDEZ, RPR, FPR
13                             Official United States Court Reporter
                               Wilkie D. Ferguson Jr. U.S. Courthouse
14                             400 North Miami Avenue, Suite 13-3
                               Miami, Florida  33128     305.523.5118
15                             gphofficialreporter@gmail.com

16

17

18

19

20

21

22

23

24

25