**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 15-20106-CR-SCOLA**

**UNITED STATES OF AMERICA**

**vs.**

**PATRICK KILLEN, JR.,**
    a/k/a "rebeccatill05,"
    a/k/a "beverlyhills05,"
    a/k/a "channelizzabel,"

        **Defendant.**
_____/

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through the undersigned Assistant United States Attorneys, hereby files this sentencing memorandum in anticipation of the August 27, 2018 resentencing of Patrick Killen, Jr. ("Defendant"). Based on the sentencing factors set forth in 18 U.S.C. § 3553(a), and in particular based on the government's survey of similar cases of child pornography produced through online extortion, the government maintains that the totality of the circumstances supports imposing the advisory Guidelines sentence of 274 years' imprisonment.

The government acknowledges that, on direct appeal, the 11th Circuit vacated and remanded the Defendant's original sentence of 139 years. However, the panel did so for a specific and narrow reason: because the previous district court stated that disparity was not a legitimate consideration to take into account when fixing a sentence under § 3553(a). The panel did not hold that Killen's 139-year sentence was per se unreasonable, nor did the panel impose any upper or lower bound on the range of sentences that this Court could consider on remand. While the Defendant has identified some mitigating characteristics in his background, there are numerous

serious aggravating factors that support the government's recommended sentence: the remorselessness of the Defendant's conduct; his inability to cease his illegal and harmful behavior after being confronted by the authorities; and, most importantly, the staggering number of minors victimized by Killen and the need to deter this new and proliferating form of child sexual abuse.

## BACKGROUND

### A.    Factual Background

On July 10, 2015, a federal jury in Miami convicted the defendant, Patrick Killen, Jr., of fifteen counts related to the production of child pornography; distribution and receipt of child pornography; transmission of interstate threats, i.e., extortion of his victims to coerce them into producing child pornography; and possession of child pornography.  The jury found Killen not guilty of one count of destruction of records of a federal investigation.

The following facts came out at the Defendant's trial (DE140; DE141; DE142; DE143; DE144) and first sentencing proceeding (DE148).

By the time Patrick Killen, Jr. was twenty years old, he had amassed a collection of thousands of videos and images depicting minors engaged in sexually explicit conduct (DE140:137; DE141:217-18).  Killen obtained child pornography through a variety of avenues. He downloaded it over the internet and exchanged such files with online acquaintances, with a focus on images and videos of eleven- to fourteen-year-old male minors (DE141:55-60, 87; DE142:34-35, 100).  Killen, however, did not merely consume existing content.  As Killen admitted during his trial testimony, he induced minors to take and send him nude pictures of themselves, predominantly photographs of young boys in a state of arousal (DE144:112-13). Killen also shared these images with his online community of child pornography collectors

2

(DE141:67-103, 265-66).  In total, Killen obtained nude images from at least 288 minors through his scheme (DE148:8).

Killen's modus operandi was to impersonate a young woman on social media platforms, including Instagram, Facebook, and a messaging application called Kik, in order to strike up conversations with minors (DE140:121-23; DE141:84-85, 178-79).  He assumed a number of identities, mostly using the names "Rebecca Till," "Chanel Izzabel," or variations of those names such as RebeccaTill05 (DE140:172-74; DE141:32, 68-69; DE142:6; DE144:143).  As part of these conversations, Killen sent images, purportedly of his female alter egos in various stages of undress, to the minors (DE140:99-100; DE141:243; DE142:95-96).  Killen demanded that they send him pictures in return, including "mirrors" or mirror shots that included the subject's face and erect penis (DE140:98-99, 128, 173-74; DE142:53-54).  Killen used this technique to contact hundreds of potential victims through Kik alone, at one point bragging to another child pornography collector, "I've had 50 new boys Kik me [i.e., contact him through that application] yesterday" (DE142:50).  *See also* (DE140:223-24; DE141:8-9).

Killen's online conversations established that he had researched his victims.  For example, he stated in one recorded conversation that one of the minors "lives ten minutes away from me," and "I know what school he goes to," and suggested at another point that he had seen another minor in person at Disney (DE141:73-74, 95-97).

Sometimes, after initially complying with Killen's requests for nude pictures, a minor sensed something suspicious and attempted to cease further contact with Killen (DE141:256; DE142:26-28).  Killen threatened uncooperative victims by claiming that he would publish the images that they already had sent him to a public social media platform like Instagram unless they

3

continued to provide him with additional images (DE140:124; DE141:256; DE142:26-28).  Killen described how he coerced his victims, and the potential effects that his threats could have, in an online conversation with "Karucem," a fellow child pornography consumer:

Q.  [W]hat does Karucem say next?

A.  A question.  When you [Killen] blackmail a boy, did he tell you if you post his pics, he kills himself?

. . . .

Q.  And how does BeverlyHills05 [Killen] respond in the next line?

A.  [Killen] Ah, ha, ha, ha.  Yes. . . . But they don't.

Q.  And Karucem says?

A.  When they reply it, I will kill myself, what do you answer them?

Q.  And what does BeverlyHills05 [Killen] say?

A.  [Killen] It depends on the situation. . . . I say more like, I don't care just send. . . . Or just ignore them if they say it.

(DE141:76-77).

Killen's threats often had their intended effect of coercing his victims to comply with his commands, including demands that they assume particular poses that provided Killen's desired view of their genitalia (DE141:255-59).  At trial, Killen admitted that he extorted male minors in order to obtain such images (DE144:180).

Seven FBI agents or analysts and a police officer testified at Killen's trial regarding how the authorities uncovered this conduct.  Beginning in 2013, law enforcement agencies in multiple jurisdictions opened criminal investigations into "Rebecca Till" and "Chanel Izzabel" social media

4

accounts, which reportedly had been used to induce young boys to provide nude images of themselves, including, in some cases, by the use of threats (DE140:82-86; DE141:165-67). The law enforcement agencies obtained business records from Kik, a Canadian company, that documented the use of its application by the suspect and included images that he had sent or received over Kik (DE140:86, 105; DE141:169). In addition, after tracing this activity to an IP address located in Hialeah, Florida, the FBI dispatched two agents to conduct a knock-and-talk interview at the suspect's residence, which turned out to be the Killens' home (DE140:101-03, 155; DE143:125).

During the February 2014 interview, Killen admitted to the FBI agents that he used the username RebeccaTill05 to contact minors and to convince them to send him nude images (DE140:172-74; DE143:148-53). In addition, he provided his consent for the FBI to take and search his MacBook computer, his phone, and two thumb drives (DE140:162-63, 175-76; DE143:142-45). The FBI's forensic examination of these devices, which was the subject of testimony from several FBI computer analysts, yielded evidence of thousands of Kik chat messages between Killen and minors, as well as his possession of large amounts of child pornography, including video files with titles such as "two nine year old boys suck each other then sucks man" (DE141:59) and video files depicting adults raping minors (DE143:179). *See also* (DE140:227-28; DE141:20-21, 57-63, 217-20; DE143:164-67, 178-84). Killen's computer also contained incriminating recorded conversations between him and other child pornography consumers, including discussions of interactions with minors, techniques for obtaining nude images from them, and offers to exchange child pornography on a program called Gigatribe (DE141:67-103).

5

During Killen's February 2014 encounter with the FBI, the agents informed Killen that his actions were illegal (DE143:154-57). Killen's parents followed up by emailing one of the agents the next day and informing her that they intended to take Killen to a psychologist (DE144:64-65). However, this encounter with law enforcement did not put an end to the Defendant's conduct; based in part on the evidence seized from his electronic devices, the FBI executed a search warrant at the Killens' residence approximately a year later, in March 2015 (DE142:126). That search yielded another laptop computer and external storage devices from Killen's room (DE142:132-36). Forensic analysis revealed that those devices held (or had held in the past) additional images and videos depicting minors engaged in sexually explicit conduct, including a video of an approximately eight-year-old child being raped (DE143:8-9, 16-17, 42-59, 195-99, 213-14). Killen obtained some of these images and videos months after he confessed to much of the offense conduct in February 2014; for example, he downloaded one such file on September 24, 2014, which depicted two children approximately ten years old engaged in a sex act (DE143:42-45). The Defendant's devices also contained new stored conversations between him and "Karucem" that discussed the creation and distribution of child pornography (DE143:23-27).

The electronic devices seized from Killen contained recorded conversations that documented in vivid detail how Killen manipulated and extorted three identified minor victims into sending him lascivious images. These three exemplars formed the basis for the production and extortion charges in the indictment.

### 1.    Conduct as to Minor Victim G.F.

In September 2013, Killen contacted the minor victim G.F. on Kik (DE141:244, 249). Killen steered an initially innocuous conversation to sexual topics, including masturbation, before

requesting that G.F. send nude pictures of himself (DE141:248-51). Killen received photographs of G.F.'s erect penis and of G.F. exposing his genitalia and his face in the mirror (DE141:251-55).

When Killen continued to request images with different poses, G.F. refused (DE141:256). Killen then threatened to publish G.F.'s nude pictures on social media unless he complied (id.). The threats immediately changed the tenor of the conversation, as G.F. urged, "Please don't put them on Insta[gram]. I'm begging" (DE141:257). Just as Killen described his technique to another child pornography collector, his response to G.F.'s distress was simply to state, "Send"—i.e., commanding G.F. to provide the precise view of his genitals that Killen requested (*id.*). Killen continued to threaten G.F. when he found the resulting image unsatisfactory, even as G.F. pleaded with "Izzabel" to stop: "[G.F.] says, I'm not hard anymore. I'm scared that you'll post them. I'm like freak[ing] out right now. I will literally go to jail. I'm crying right now. Please" (DE141:258). Killen's continued threats broke G.F.'s resistance, and the minor sent additional nude photographs (DE141:259-60). When G.F. told Killen that he was crying and felt that Killen had "just threatened my life," Killen responded, "Laughing my f---king a-- off. Shut the f--- up" (DE141:261). G.F. was fourteen at the time (DE142:102).

Using the Kik application, Killen sent an image of G.F. to a child pornography collector named "Vanyher" (DE141:265-66). When "Vanyher" complimented the image, Killen then sent additional photographs of G.F. exposing his genitals (DE141:266-67). Killen told "Vanyher" that he believed that G.F. was thirteen (DE141:267). "Vanyher" is the same person as "Karucem," discussed above (DE142:77).

G.F.'s mother testified that, in the aftermath of Killen's abuse, her son "was visibly shaking and very pale, very distraught, very upset, very apologetic and just kept saying, I'm sorry, I'm

7

sorry, I'm so scared, I'm sorry" (DE142:104).  His encounter with Killen was traumatic:  "[H]e was to the point where he didn't want to go to school.  He was afraid that the kids would know. He wasn't sure where these pictures would surface. . . . [H]e was thinking that maybe we would have to move" (DE142:105).

### 2.      Conduct as to Minor Victim J.C.

Killen, posing as "Chanel Izzabel," had a substantially similar interaction with the minor victim J.C. (DE141:267-73; DE142:7-28).  Killen knew that J.C. was thirteen years old, and J.C. self-identified as "a little kid" (DE142:11-12).  Killen convinced J.C. to send nude photographs of himself with his face and erect genitalia exposed, including images where J.C. was lying on his bed (DE142:16-25, 83).  When J.C. refused to send more images, Killen threatened to post the previously provided photographs to social media, which resulted in J.C. sending additional nude pictures (DE142:26-28).  Killen also distributed J.C.'s images to "Vanyher" (DE142:29-33).

### 3.      Conduct as to Minor Victim M.F.

Killen also contacted the minor victim M.F. through the Kik application (DE141:232-34). Killen identified himself as a fourteen-year old female during a September 1, 2013 conversation that quickly grew sexual in nature (DE141:236-38).  During this conversation, M.F. stated that he was thirteen years old (DE141:238).

Killen, pretending to be "Izzabel," requested that M.F. provide her with pictures, beginning with a partially clothed picture of M.F. in his underwear but rapidly escalating to requests for several pictures of M.F.'s erect penis, including one that included his face (DE141:240-42).  Killen in turn sent M.F. a photograph of a nude female exposing her breasts, purportedly a picture of his

alter ego "Izzabel" (DE141:243).  Using the Kik application, Killen shared several of the images that he received from M.F. with "Vanyher" that same day (DE141:264-65).

Notably, Killen decided to testify in his own defense, but the jury rejected his meek and untruthful claim that he obtained these images solely out of curiosity and not out of a prurient interest.  During his testimony, Killen confessed to using Kik to obtain nude photographs of minor boys, and to threatening children to get the images he wanted (DE144:150).  Given his admissions and the comprehensive evidence presented at trial, the jury readily concluded that Killen produced, distributed, received, and possessed images of children engaged in sexually explicit conduct; and that he made interstate threats against children as part of his far-reaching criminal scheme.

## B.      Original Sentencing Proceeding

Killen's PSI established that his total offense level was the maximum possible, 43; in conjunction with his criminal history category of I, the PSI concluded that his advisory Guidelines range was life imprisonment (PSI ¶¶ 107, 110, 153).  Because Killen's offenses of conviction had statutory maximum terms of less than life imprisonment, USSG § 5G1.2(d) applied and his advisory guidelines range became 3,288 months, which represented the sum of the maximum terms for each count of conviction (PSI ¶¶ 152-53).[1]   Based on the fact that Killen had 288 identified victims and the severity of the offense conduct, the United States requested that the sentencing court impose the advisory Guidelines sentence of 3,288 months, or 274 years (DE148:54).

---

[1] Counts 1, 3, and 5 each carry a statutory maximum of 30 years' imprisonment; Counts 2, 7 through 11 each carry a statutory maximum of 20 years' imprisonment; Counts 4 and 6 each carry a statutory maximum of 2 years' imprisonment; Counts 12 and 15 each carry a statutory maximum of 20 years' imprisonment; and Counts 13 and 16 each carry a statutory maximum of ten years' imprisonment—for a total of 274 years' imprisonment.

Killen continued to demonstrate no acceptance of responsibility or remorse for his crimes and, on the contrary, disrupted the sentencing proceedings with several outbursts. During the government's argument, Killen repeatedly interjected in a profane manner to attack the trial AUSA's credibility, including accusing him of "f--king lying" and calling him an "idiot" (DE148:56). During his own statement, Killen made excuses for his conduct, continued to blame the government and allege misconduct that the court had found not credible in his rejected motion to suppress certain evidence, and referred to his victims as "supposed victims" (DE148:43). He remained in deep denial about his disorders and the reprehensible nature of his own conduct, insisting that he "ha[d] no interest in boys" (DE148:44).

In support of the Defendant's request for a downward variance to the mandatory minimum sentence of 15 years, Killen's parents and a neighbor attested to Killen's poor physical and mental health, his difficult childhood before adoption, including physical abuse that he experienced in a Romanian orphanage as a baby, and his immaturity (DE148:35-41).

The district court acknowledged that Killen had some mitigating characteristics, including "his educational, emotional issues and his issues in early childhood" (DE148:59). However, the "well-documented" severity of the conduct and the need to deter Killen and similar offenders weighed most heavily in the court's analysis:

> I'm not convinced of anything other than a substantial period of incarceration is going to deter this defendant from engaging in similar conduct. I think he's simply incapable of conforming his conduct to the requirements of the law when it comes to engaging in child pornography.

(*id.*).

The district court also highlighted his lack of remorse and willingness to perjure himself as aggravating factors:

10

[I]n this case we have a defendant who was a serial abuser of multiple victims.  He has repeatedly shown nothing in the way of any remorse.  He was certainly entitled to exercise his right to trial and not to have that be held against him.  Nobody has done that.  He doesn't have a right to take the stand and lie, which he did repeatedly.

(DE148:60).

However, as the 11th Circuit later found, the district court erred in the following statement, referring to Killen's comparison of his sentence to cases in other districts or other countries: "[Y]ou discussed a number of other sentences that have been imposed elsewhere, not only in this district, but in other countries and sentencing disparity is not a recognized basis for a sentence to be imposed.  Each of these sentences are tailored to the individual and the circumstances are different" (*id.*).

After balancing the totality of the circumstances, the court set Killen's term of imprisonment at 1,668 months, a downward variance from the advisory Guidelines sentence of 3,288 months (DE148:60-62).

### C.    The Defendant's Direct Appeal

On direct appeal, the 11th Circuit affirmed the Defendant's convictions but vacated his sentence.  *United States v. Killen*, 729 F. App'x 703 (11th Cir. 2018).  The panel first addressed and rejected Killen's arguments that his sentence was procedurally unreasonable, determining that "Killen's sentence did not result from procedural error" and that the calculation of his advisory Guidelines range of 3,288 months was correct.  *Id.* at 717.

The panel concluded, however, that Killen's sentence was substantively unreasonable because the district court refused to consider a relevant factor: the need to avoid sentencing disparities.  *See id.* at 717-18.  The opinion focused on the district court's comment that "sentencing disparity is not a recognized basis for a sentence to be imposed," and observed that "§

11

3553(a) lists 'the need to avoid unwarranted sentencing disparities' as a factor to be considered." *Id.* at 717. As the panel explained, "this factor require[d] particular attention in the context of child pornography offenses, in light of the wide range of conduct that can constitute this type of offense, as well as the breadth of sentences authorized under the child pornography guidelines." *Id.*

The panel noted one example of a child pornography production case, *United States v. Kapordelis*, 569 F.3d 1291 (11th Cir. 2009), where the defendant received "a variance above his guideline range" because he "possessed more than 500 videos and 2,000 images of child pornography, had a 20-year history of drugging and molesting minors, and had traveled to have sex with minor boys." *Killen*, 729 F. App'x at 717. The 11th Circuit observed that Killen's case did not contain some of these same aggravating factors, including "hands-on contact with a minor," that justified the upward variance in the *Kapordelis* case. *Id.* The panel did not, however, establish any upper or lower bound on the permissible sentence that this Court could enter upon remand.

## DISCUSSION

The parties do not dispute that the PSI properly calculated Killen's advisory Guidelines sentence to be the cumulative statutory maximums for the counts of conviction: 3,288 months (274 years) of imprisonment. In light of the factors set forth in 18 U.S.C. § 3553(a)(1)—particularly, the nature and circumstances of the offense and the history and characteristics of the Defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the Defendant—the United States recommends that an appropriate and reasonable punishment for this Defendant is a sentence at the statutory maximum for each count of conviction run consecutive to each other, for a total advisory

12

guideline sentence of 274 years' (3,288 months) imprisonment. Alternatively, it would also be appropriate and reasonable for this Court to reimpose the original sentence that Killen received of 139 years.

> **A.** **The 11th Circuit's Opinion in Killen's Direct Appeal Does Not Bar This Court from Imposing the Advisory Guidelines Sentence.**

As an initial matter, it is important to recognize that the 11th Circuit's decision to vacate and remand Killen's sentence does not imply that this Court must limit itself to imposing a lower sentence than his original, 139-year sentence. The error identified in the 11th Circuit's opinion was not that such a sentence was per se unreasonable under 18 U.S.C. § 3553(a). The 11th Circuit's opinion does not say, in words or substance, that such a sentence lies outside of the range of reasonable sentences in light of the facts of the case. Rather, the error identified by the panel opinion was the original district court's statement suggesting that it gave *no* weight to potential sentencing disparity, a factor expressly included among the relevant sentencing considerations by Congress. *See* 18 U.S.C § 3553(a)(6).

As the panel opinion explained:

> [O]ur careful consideration has led us to conclude that his sentence is substantively unreasonable. In imposing what amounted to a life sentence without parole, the District Court responded to Mr. Killen's argument that his sentence was disparate by saying "sentencing disparity is not a recognized basis for a sentence to be imposed." But to the contrary, § 3553(a) lists "the need to avoid unwarranted sentencing disparities" as a factor to be considered. 18 U.S.C. § 3553(a)(6). Indeed this factor requires particular attention in the context of child pornography offenses, in light of the wide range of conduct that can constitute this type of offense, as well as the breadth of sentences authorized under the child pornography guidelines.

*Killen*, 729 F. App'x at 717 (footnote omitted).

To the extent that Killen argues that *Kapordelis* or any other case cited in the direct appeal opinion sets an upper limit on his sentence (e.g., the 35-year sentence imposed in *Kapordelis*), he

misreads the 11th Circuit's opinion.  The panel does not state that the sentence in *Kapordelis* should be the upper limit of this Court's sentencing discretion upon remand.  After all, such an interpretation of the panel opinion would imply that *Kapordelis* is the only previous case of any relevance to this sentencing, and that this Court could not consider sentences pronounced in any other cases—including more closely analogous cases both factually and procedurally, some of which this memorandum discusses below.  In context, it is apparent that the panel merely offered *Kapordelis* as an illustrative example of the universe of analogous or somewhat comparable past cases that this Court should consider when weighing the potential for disparity under § 3553(a)(6).  The essential point is not that *Kapordelis* or any other single case should be outcome-determinative here, but that this Court should afford careful attention to a comparison of this case with its closest analogs before determining the sentence.

This Court remains free to resentence Killen to any term of imprisonment on remand.  A similar situation occurred in *United States v. Rosales-Bruno*, 789 F.3d 1249 (11th Cir. 2015), which affords an instructive example.  There, the district court erred in the calculation of the advisory Guidelines range, and the district court vacated and remanded the defendant's 87-month sentence.  *Id.* at 1252-53.  Upon remand, however, even with a significantly lower advisory Guidelines range, the district court chose to impose the same 87-month sentence because it concluded that term of imprisonment was necessary to satisfy § 3553(a).  *Id.* at 1253.  The defendant appealed for a second time, arguing that the imposition of an identical sentence was unreasonable.  *Id.*  As the 11th Circuit explained, "[t]o arrive at an appropriate sentence, the district court must consider all of the applicable § 3553(a) factors"; however, there is no obligation to "give all of the § 3553(a) factors equal weight."  *Id.* at 1254.  The district court remained in the

14

best position to determine whether a greater, lesser, or the same sentence was appropriate because the district court was "in a superior position to find facts and judge their import under § 3553(a) in the individual case because he sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.* at 1255 (internal quotation marks omitted).

The 11th Circuit vacated Killen's sentence here because, by its reading of the record, the previous district court did not consider all of the applicable § 3553(a) factors.  For the reasons explained below, this Court should—after considering all of the relevant § 3553(a) factors— impose the advisory Guidelines sentence (or the same sentence imposed in Killen's first proceeding) here.

### B. The § 3553(a) Factors, Including the Sheer Number of Victims and Including Consideration of Disparity, Favor Imposing the Guidelines Sentence.

It is well-settled that a district court must consult the Sentencing Guidelines Manual and consider the advisory sentencing guidelines range for an instant offense prior to rendering a sentence. *United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005).  After calculating the sentencing guidelines range, a district court must next consider and balance the sentencing factors in Title 18, United States Code, Section 3553(a) to determine a "reasonable" sentence, which may be more or less severe than that provided for by the guidelines range. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

Section 3553(a) requires a sentencing court to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection.  18 U.S.C. § 3553(a).  The sentencing factors laid out in § 3553(a) favor the advisory Guidelines

sentence of 274 years' imprisonment or, in the alternative, the reinstatement of Killen's original sentence of 139 years.

### a. Section 3553(a)(1)

The first factor for the Court's consideration is the "nature and circumstances of the offense and the history and characteristics of the defendant." Both factors weigh strongly in favor of imposing a guideline sentence of 274 years' imprisonment.

The severity and extent of the Defendant's criminal conduct cannot be overstated. To summarize briefly, the trial evidence demonstrated that the Defendant, while pretending to be a fourteen-year-old female cheerleader, used Kik, an Internet-based/smartphone messaging application, to induce hundreds of boys to send him sexually explicit photographs of themselves for Killen's sexual gratification and for the sexual gratification of others. He threatened to post the children's sexually explicit photographs on the internet if they refused to send him the exact photographical poses he so much desired. He traded over the internet sexually explicit images of children with other like-minded pedophiles. On multiple electronic devices and over several years, the Defendant catalogued for his viewing pleasure thousands of images and videos of children engaged in various sex acts. Many of these images and videos involved children under the age of 12 having sex with adults. The Defendant did not delete these files, rather, when considering how many different places he stored it—his computers and multiple thumb drives, he had easy access to it regardless of what computer he was using or the time of day.

The Defendant was unrelenting in his sexual abuse of children; in fact, despite being caught redhanded in February 2014 and having his electronic devices seized, he did not stop until the FBI arrested him in March 2015. On the contrary, his response to his February 2014 wakeup call was

to acquire a new set of electronic devices and resume his reprehensible predatory behavior. He trolled the internet for children and he lured them into private sexual conversations under false pretenses. When the boys expressed reticence in sending additional sexually explicit photographs, the Defendant extorted them by threatening to post the previously provided material on Instagram and other social media sites. The cruelty and remorseless nature of his actions shines through his conversations with his victims. For example, one of his victims, pleading for mercy, stated that he felt as if Killen had just had "just threatened my life," to which Killen responded, "Laughing my f---king a-- off. Shut the f--- up" (DE141:261). In this respect, Killen proved that he not only talked the talk; he walked the walk. As he explained to his fellow child pornography collector, he greeted something as severe as a threat of suicide with responses like "I don't care just send. . . . Or [I] just ignore them if they say it" (DE141:76-77). The extent of his criminal conduct and the sheer number of victims he sexually abused is staggering.

To date, the FBI has identified *288 victims* who were sexually abused by the Defendant. As this Court can see in the statements from some of the victims' family members at the prior hearing, and as the Court will have the opportunity to hear firsthand at the sentencing hearing, these victims have suffered serious psychological harm as a result of the Defendant's conduct. Victims have experienced extreme emotional and behavioral changes in the wake of their abuse, sometimes withdrawing from their family and isolating themselves. They have difficulties trusting other people and social institutions that they once cherished; one of the identified victims, for example, has stopped going to church with his family after what happened. That family also has had to bear the cost of therapy to help their son and their family heal.

17

As the 11th Circuit has noted, "sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults." *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (quoting *New York v. Ferber*, 458 U.S. 747, 758-59 & nn. 9-10 (1982)). In the wake of Killen's destructive actions, it is uncertain how many of his hundreds of victims will experience these lasting negative repercussions.

Likewise, the "history and characteristics of the defendant" also militate strongly in favor of imposing 274 years' imprisonment. Significantly, at least to the government's knowledge, Defendant continues to assert his innocence notwithstanding his convictions and the 11th Circuit's affirmance of those convictions. During trial, Defendant repeatedly denied receiving the images and images for sexual purposes. He to date has not accepted responsibility for any of his child pornography crimes and he exhibits no remorse. The Court can and should consider this in fashioning an appropriate sentence in this case. *See, e.g., U.S. v. Mateos*, 623 F.3d 1350, 1366-67 (11th Cir. 2010) (holding that "[i]t was reasonable for the district court to consider [defendant's perjurious trial testimony and lack of remorse]" in sentencing defendant convicted of healthcare fraud to statutory maximum, which was higher than sentences of co-conspirators who pleaded guilty and cooperated).

Killen's sentencing memorandum devotes significant effort to portraying him as one of Romania's "abandoned children." However, Killen oversimplifies the academic work that he cites—the Bucharest Early Intervention Project recounted in the book Romania's Abandoned Children (2014)—and fails to appreciate its implications for his own circumstances. The BEIP

18

was a rigorously controlled investigation of foster care as an alternative to institutionalization. Researchers included 136 abandoned infants and toddlers in the study and randomly assigned half of them to foster care created specifically for the project. The other half stayed in Romanian institutions, where conditions remained substandard. Over a twelve-year span, both groups were assessed for physical growth, cognitive functioning, brain development, and social behavior.

Summary of Romania's Abandoned Children, Harvard Univ. Press, *available at* http://www.hup.harvard.edu/catalog.php?isbn=9780674724709. In other words, the negative outcomes identified in the book—and quoted in Killen's memorandum—occurred most severely in the control group of children who *remained* institutionalized through their early adolescence. In contrast, children in the BEIP foster care group, despite spending two or more years in such difficult conditions, demonstrated the ability to bounce back and recover cognitive functioning equal in many respects to children raised by their birth families. *See* Johanna Bick et al., Effect of Early Institutionalization and Foster Care on Long-term White Matter Development (attached hereto as Exhibit 1). Killen, while adopted slightly later than this group (the last of this cohort was fostered at 31 months, *see* Exhibit 1, at 213), enjoyed the benefits of a stable, two-parent home and an ordinary American middle-class upbringing for the vast majority of his life.[2]

Thus, although Killen attempts to compare himself with this particularly disadvantaged group, he in fact enjoyed more advantageous life circumstances. For example, research in this field attests that "the IQs of internationally adopted children often fall within the normal range, whereas the IQs of comparably aged children who remain in institutions often fall 2 to 3 [standard deviations] below the mean." Exhibit 1, at 212. This finding is particularly notable in the context

---

[2] Notably, Bick's work found "no significant associations between intervention timing"—i.e., the age between 5 and 31 months when entering foster care—"and white matter integrity when accounting for the effects of child's age at the time of the scan." Exhibit 1, at 216.

of this case, where Killen's own expert concluded that Killen has an average IQ score, post-high school level reading ability, and no major psychotic disease.  In short, although it is natural to have sympathy for Killen's early childhood circumstances, it is unfair and inaccurate to analogize him to the institutionalized children in the BEIP control group, who spent their entire lives in that setting and suffered resulting "social, emotional, linguistic, and cognitive impoverishment." Exhibit 1, at 211.  Thus, this Court should not consider the BEIP and related academic work as a significant mitigating factor in Killen's favor, much less as an explanation for the horrific conduct that he committed as an adult.

### b.  Section 3553(a)(2)(A)

The next factor for the Court's consideration is the "need for the sentence imposed …to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A).  This is the "'just deserts' concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly." *United States v. Irey*, 612 F.3d at 1160, 1206 (internal quotation marks omitted) (citing *Pugh*, 515 F.3d at 1195).  Accordingly, the more serious the crime, the "greater the need for retribution and the longer the sentence should be." *Irey*, 612 F.3d at 1206.

In this regard, the Eleventh Circuit is of the view that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses, and courts have upheld lengthy sentences in these cases as substantively reasonable." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009); *see e.g. United States v. Johnson*, 451 F.3d 1239, 1244 (11th Cir. 2006) (upholding as reasonable a within guideline sentence of 140-year sentence for abusing and photographing three boys between the ages of 8 and 16 based on consecutive statutory maximums

20

under 18 U.S.C. § 2251(e) and § 2252A(b)(1));  *see e.g. United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five 8- to 11-year-old girls, including two of his granddaughters), *cert. denied*, 555 U.S. 1123 (2009).  Notwithstanding the Defendant's age and lack of criminal history, certainly the facts and circumstances of this case meet and in some cases exceed the conduct of defendants who received similar or higher sentences than the sentence the United States now requests.

The gravity of Defendant's criminal conduct is also reflected in the harm he has inflicted on the victims he sexually abused.  The Eleventh Circuit acknowledged the significant harm that child pornography offenses inflicts on a victim: "[T]he material produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."  *See Pugh*, 515 F.3d at 1195, n.11.  Evident from the testimony of the victims' parents at trial is that the victims in this case have suffered, and will continue to suffer knowing the pornography the Defendant produced will forever exist on the internet.  As this memorandum will discuss in more detail below, few if any comparable cases feature both this extortive form of producing child pornography combined with distribution to other child pornography collectors, which amplifies the severity of the offense.

To the extent that Killen attempts to distinguish his form of sexual exploitation from direct physical molestation, it is important to recognize that the harms from so-called "sextortion" cases are comparable to those experienced by other child sexual abuse victims.  Although a relatively new phenomenon, a number of studies have examined the long-term impact of sextortion on its victims.  The Department of Justice's 2016 report on child exploitation prevention efforts

described sextortion as "by far the most significantly growing threat to children." The National Strategy for Child Exploitation Prevention and Interdiction at 75, U.S. Dep't of Justice (April 2016), *available at* https://www.justice.gov/psc/file/842411/download. The report noted that, in a sample of 43 sextortion cases, 28 percent had at least one victim who committed or attempted suicide. *Id.* at 76. "Sextortion victims engage in cutting, have depression, drop out of school or have their grades decline, as well as engage in other forms of self-harm at an alarming rate." *Id.* Another study conducted by the Crimes Against Children Research Center at the University of New Hampshire surveyed over 600 online sextortion victims, who reported losing a relationship with a friend, family, or partner 25 percent of the time, seeing a medical or mental health specialist 21 percent of the time, and other effects such as having to move to a new neighborhood or change schools or jobs. See Janis Wolak and David Finkelhor, Sextortion: Findings from an Online Survey at 77 (June 2016), *available at* http://www.unh.edu/ccrc/pdf/Sextortion%20Report%20 Final%20June%202016.pdf. They also found that, unfortunately, about half of victims do not attempt to seek help or are too embarrassed, ashamed, or intimidated to report the abuse to family members, and that only 16 percent reported their victimization to the police. *Id.* at 39-48.

Victims "feel a justified sense of powerlessness and vulnerability" while "at the mercy of their hackers"; some victims have characterized the feeling as being "like a 'slave'" or "being virtually raped." Benjamin Wittes et al., Sextortion: Cybersecurity, Teenagers, and Remote Sexual Assault at 23 (May 2016), *available at* https://www.brookings.edu/wp-content/uploads/2016/05/sextortion1-1.pdf. "The traumatic effects on child victims can be particularly severe." *Id.* As the Brookings Institution explained in a survey of these offenses:

22

> Children are often the easiest targets of these sorts of crimes not only because of their social vulnerability, but because they often do not realize that what is happening is criminal behavior.  They are often left defenseless and too scared to admit to their parents or to anyone else what is happening. They also sometimes have no idea when threats are completely idle ones. One young sextortion victim complied with demands for nude photos because her attacker threatened to "blow up" her computer if she did not, and the computer was a treasured new Christmas present.

*Id.*

As that same study remarked, "[s]extortion is brutal" and "is a form of sexual exploitation, coercion, and violence, often but not always of children.  In many cases, the perpetrators seem to take pleasure in their victims' pleading and protestations that they are scared and underage.  In multiple cases we have reviewed, victims contemplate, threaten, or even attempt suicide— sometimes to the apparent pleasure of their tormentors."  *Id.* at 5.

As the Defendant's case demonstrates, sextortion also is worse than other forms of exploitation in a significant way: by leveraging modern social media technology, these offenders are able to reach far more minor victims and do more widespread damage in a much shorter period of time.  "Sextortionists . . . tend to be prolific repeat players," with more than a dozen cases where "there were more than 100 victims."  *Id.* at 4.  The Department of Justice's findings back up this commonsense notion:  "Modern technology allows offenders' access to an unlimited global population of minors they may seek to contact, groom, entice, coerce, lure, trick, or extort into producing and transmitting sexually explicit content," and perpetrators "typically do so in large numbers," which means that "[s]extortion cases tend to have more minor victims per offender than all other child sexual exploitation offenses."  National Strategy at 74-75.

23

c.  **Section 3553(a)(2)(B)**

The next factor for the Court's consideration is "the need for the sentence imposed…to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The lengthier the punishment, the greater the deterrent effect the sentence will have. The United States recognizes that it seeks a length of imprisonment tantamount to life. The United States also understands that given the Defendant's age, a sentence of 274 years (or 139 years) may be viewed as purely academic since it will cease to have any punitive impact on the Defendant at some point. However, the impact of a sentence on the particular defendant is a separate and distinct consideration from that of the impact that the sentence will have on others. *See Pugh*, 515 F.3d at 1195 n.11. In this case there is a significant societal interest in deterring those who using the internet to sexually abuse children. A substantial sentence strongly signals to prospective offenders that the justice system offers no leniency to those who choose to abuse the children, and in particular, those who use the internet to do so. Prospective offenders who are considering such offenses must be strongly deterred and made aware of the severe consequences that will follow regardless of where they choose to sexually abuse children. This factor therefore also weighs in favor of a 274-year sentence.

General deterrence is particularly important here because, as discussed above, sextortion lends itself to mass victimization. The defendant's request for the mandatory minimum sentence of 15 years amounts to approximately 19 days per minor victim. Even a 274-year sentence in this case amounts to approximately one year for every child whose pornographic images Killen obtained through his tactics of deception and, in some cases, extortion. The 139-year sentence that the previous district court imposed is less than six months per victim. Moreover, as the case agent

24

noted in the previous sentencing hearing, her estimation of 288 victims was "a very, very conservative estimate" (DE148:16) because the electronic records were incomplete, and much of Killen's online activity had not been backed up to his computers to be available for forensic retrieval. There is good reason to suspect that Killen's conduct was much more far-reaching; for instance, as proven at trial, he bragged to a fellow child pornography consumer, "I've had 50 new boys Kik me yesterday" (DE142:50). 50 potential new victims in a *single* day.

Sentencing Killen to a similar or lower sentence compared to a defendant who commits this offense against a single victim or a handful of victims effectively sends the message that additional victims begin to mean nothing because their suffering will not result in any substantial addition to one's sentence of imprisonment. Such a sentence would fail to deter a person like Killen, once he has begun committing sextortion, from rapidly multiplying his number of victims—a realistic possibility with the advent of social media technology, which allows a user to find dozens of new potential victims on a daily basis. Such a sentence also would convey that no amount of additional non-contact victims can ever outweigh one victim who suffers direct physical abuse, despite the fact that the psychological harms suffered in both scenarios and the specter that the victim's photographs have been widely distributed are similar. The sentence requested by the government, on the other hand, sends a message that every victim matters. As this memorandum discusses in more detail below, the average sentence for sextortion cases involving more than 100 victims is 60 years, with multiple sentences in the 80- to 110-year range.

### d.  Section 3553(a)(2)(C)

This factor requires the Court to consider "the need for the sentence imposed…to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Based on the

25

Defendant's extensive history of sexually abusing children and the nature and extent of his offense conduct, the United States maintains that no sentence short of the statutory maximum as to each count will adequately protect the public from Defendant victimizing more children in the future. The fact that the defendant failed to cease his actions, after being caught in February 2014 by the FBI and having his electronic devices seized with large volumes of child pornography, demonstrates that the defendant is unable to control his conduct or conform to the law.

### e.   Section 3553(a)(4)

The Court must next consider the sentencing guidelines range when fashioning a defendant's sentence.  *See* 18 U.S.C. § 3553(a)(4) ("The court…shall consider…the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines…").  *See also Pugh*, 515 F.3d at 1200.  Here, Defendant's advisory guideline range is life imprisonment.  The United States seeks a within-guideline sentence of 274 years.  The previous district court imposed a sentence of 139 years, which was below the advisory Guidelines sentence.  Accordingly, this factor also weighs in favor of the requested sentence.

### f.   Section 3553(a)(5)

The Court must next consider "any pertinent policy statements" in the guidelines.  *See* 18 U.S.C. § 3553(a)(5).  The relevant policy statements deal with departures.  In this case, the United States is not seeking a departure or a variance.  Nevertheless the policy statements applicable in this case weigh in favor of a significant sentence.  *See* U.S.S.G. § 2G1.3, n.7, which provides that an upward departure may be warranted where offense involves more than 10 minors; citing

26

U.S.S.G. § 5K2.8, providing that upward departure may be warranted where defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim).

**g.   Section 3553(a)(6)**

The final factor for the Court to consider, and the one identified by the 11th Circuit's opinion as the reason for remand, is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The government conducted a thorough inquiry to locate similar sextortion cases, i.e., where the perpetrator obtained child pornographic images from his victims through means of threats or online deception and subsequently faced charges similar to the ones in this case.[3] Such cases bear the closest factual resemblance to this one.  The table contained in Exhibit 2 compiles 55 similar cases and includes pertinent facts such as the number of victims, the counts of conviction, the length of the defendant's sentence, and the advisory Guidelines.  This case features significant aggravating circumstances not all present in any of the other cases; or, to put it another way, those cases feature mitigating circumstances not present here.  For example, few if any cases concerned a comparable number of victims and only a few other sextortion cases went to trial or featured a defendant who earned the obstruction of justice enhancement.  Thus, there is no unwarranted disparity in sentencing Killen to the advisory Guidelines sentence here.

Close examination of these comparable cases yields the following observations.

---

[3] One observation from the Brookings Institution's study is that some sextortion cases are prosecuted under cyberstalking laws or state laws that are a poor fit for capturing the severity of the offense conduct, and which result in much lower sentences.  Wittes, Sextortion at 4-5, 16 (noting that "weak state laws . . . are under-punishing serious offenders").  Exhibit 2 includes only defendants convicted of at least one child pornography production count under 18 U.S.C. § 2251(a) because those cases are the best analogs for this one.

First, the arithmetic mean of all of those sentences is approximately 32 years, and the range of definite terms of imprisonment in these cases varies from 15 to 110 years.  Although the sentences in these other cases are significant, it is noteworthy that few cases had comparable advisory Guidelines sentences of 270 years or more, which reflects the seriousness of Killen's convictions.  Thus, the simple average term of years, although substantial, includes many cases less severe than this one.  The average imprisonment term in cases with 20 or more victims is over 45 years, while the average term in cases with more than 100 victims is over 60 years.[4]  In addition, these averages do not include the fact that one case included in Exhibit 2 resulted in a life sentence.

Second, the number of victims in most cases is lower than the 288 identified through the painstaking efforts of the FBI here.  As the average terms of imprisonment indicate, and as one would expect, the appropriate sentence increases as the number of victims increases.  The government has located only eight cases where, based on the arguments raised at the sentencing phase, it appears that there were more than 100 victims.  In other words, in terms of number of victims impacted, Killen is among the top ten worst sextortion offenders ever apprehended.

*United States v. Chansler*, Case No. 3:10-CR-100 (M.D. Fla.), offers a particularly instructive example—and the closest analog to Killen's case—because it featured a defendant close in age to Killen, who victimized a similar number of minors, and who faced a similar advisory Guidelines sentence of 270 years.  Case No. 3:10-CR-100, DE205:8.  The government identified between 100 and 350 minor victims, at least five of whom attempted suicide in the wake

---

[4] In Exhibit 2, the cases with 20 or more victims are *Dickerson*, *Vance*, *Connolly*, *Shea*, *Brandt*, *Ostrowski*, *Finkbiner*, *Bivins-Breeden*, *Chansler*, *Bogomol*, *Harris*, *Wheeler*, *Fontana*, *Martynenko*, *Wilcox*, *Smith*, *Ritzer*, *Schmitz*, and *Ables*.  The cases with 100 or more victims are *Dickerson*, *Connolly*, *Finkbiner*, *Chansler*, *Harris*, *Martynenko*, *Wilcox*, and *Ables*.

of Chansler's abuse. *Id.* at 33, 61-62. The defendant engaged in similar extortive behavior while in his mid-20s by imitating a 15-year old boy and manipulating 13- to 15-year old female minors into sending sexually explicit or suggestive photographs before then using the threat of publishing those photographs to coerce his victims to send more sexually explicit material. *Id.* at 14-15, 30, 41-42. The district court remarked on the "cold and cruel and unapologetic" nature of Chansler's predatory behavior, which included threatening young girls who were "begging, crying, pleading for him to stop"—to which he responded with comments like, "You're almost done, keep going until I say so. See, that wasn't so bad." *Id.* at 49. *Compare* (DE141:76-77, 261 (documenting Killen's response to his minor victim's pleading: "Laughing my f--king a—off. Shut the f--k up")). The court in *Chansler* weighed the § 3553(a) factors and ultimately sentenced the defendant to a 105-year term of imprisonment. *Id.* at 139. The length of that sentence confirms that a similarly severe sentence is appropriate here, even in light of the mitigating factors identified by Killen, several of which Chansler shared (such as his relatively young age and emotional or mental disorders). Moreover, unlike Killen, the defendant in *Chansler* pleaded guilty and, therefore, he both accepted responsibility *and* did not obstruct justice.

Two other cases with a high number of victims warrant discussion because they also provide good analogs for this case. In *United States v. Ivory Dickerson*, Case Nos. 06-CR-238 & 07-CR-150, a 33-year old defendant received a 110-year sentence for similar offenses, which he began committing in his 20s. Case No. 06-CR-238, DE48:4; DE49:38-41. The 110 years represented his maximum sentence and also his advisory Guidelines range (the sum of the maximum terms of his five counts of conviction). In *Dickerson*, the sentencing court expressly noted as one of its reasons for pronouncing that significant sentence the fact that Dickerson

"victimize[d] some 100 children."  Case No. 06-CR-238, DE49:45.[5]  In *United States v. Robert*

*Dion Ables*, Case No. 17-CR-38 (N.D. Tex.), the defendant pleaded guilty to two 18 U.S.C.

§ 2551(a) charges and a receipt charge and faced a maximum sentence and advisory Guidelines

sentence of 80 years.  The district court imposed the maximum sentence, explaining that it was

"one of the most egregious cases" it had encountered because Ables had 100 and 200 victims

between the ages of 14 and 18.  Case No. 17-CR-38, DE37:13-14.

Third, there is a significant distinction between this case and almost all of the comparable

cases listed in Exhibit 2: the defendants who commit such crimes overwhelmingly plead guilty.

Their acceptance of responsibility—and their avowed remorse for their crimes, in contrast to

Killen's defiantly taking the stand and perjuring himself—is a significant mitigating factor that

explains, in part, the lower sentences that they received.  The United States identified only four

sextortion cases that went to trial.  Of those past examples, the one that bears the most similarity

to this case is *United States v. Daniel Chase Harris*, Case No. 14-CR-76 (E.D. Va.).  Harris was

in his 20s when he began committing his offenses and had up to 275 victims.  *See* Case No. 14-

CR-76, DE149:6; DE150:11.  Like Killen, Harris went to trial and attempted to obstruct justice.

*See* Case No. 14-CR-76, DE150:12-18.  Unlike Killen, however, Harris had a decorated career of

military service.  *See* Case No. 14-CR-76, DE149:6-10.  Even with that powerful mitigating

---

[5] Subsequent reports indicated that Dickerson in fact may have attempted to contact as many as 3,800 victims.  Because the court was informed that his victims numbered in the hundreds, however, its sentencing decision remains an appropriate comparison here.  Notably, Dickerson's coconspirator, Patrick Connolly, pleaded guilty in a separate proceeding and received the maximum term of 30 years on one § 2251(a) count, with the district court remarking, "If I could sentence you to life, I would."  *U.S. v. Patrick Connolly*, Case No. 09-CR-47 (M.D. Fla.), DE102:55.

circumstance, the government recommended—and the district court imposed—a 50-year sentence for his offenses.

Fourth, only a minority of these cases included some evidence or suggestion that the perpetrator both produced child pornography and distributed it. As this Court explained in *Pugh*, distribution gives rise to distinct harms that magnify or extend the harms from production alone. *See* 515 F.3d at 1196 ("Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." (internal quotation marks omitted)). In *United States v. Kai Lundstrom Pedersen*, Case No. 10-CR-257 (W.D. Mo.), which did feature distribution in addition to production, the district court varied *upward* and sentenced the defendant above his advisory Guidelines range. Similarly, in *Chansler*, where data analysis revealed that some of his extorted images were actively distributed, Case No. 10-CR-100, DE205:31, the court imposed a sentence of over 100 years. In *United States v. Dennis Whitt*, Case No. 14-CR-318 (N.D.N.Y.), the defendant did not distribute, pleaded guilty, and expressed remorse, yet he still received a sentence of 60 years. Case No. 14-CR-318, DE38:7-11.

Fifth, only a small minority of cases included any suggestion that the perpetrator escalated to committing hands-on sexual abuse of his victims. The two highest non-life sentences in Exhibit 2 (*Dickerson* and *Chansler*) featured no actual physical contact with minors. As the district court remarked in *Chansler*:

> I thought when I first started working on this case that the fact that Mr. Chansler had not had any contact with any of the victims, the fact that he didn't touch them, that he didn't rape them, made it somehow . . . better. That he was different than

31

> some of the other producers of child pornography that we see. . . . And then I read the letters that were attached to the presentence report, which very much like these young courageous ladies here in court make you realize that it's just as bad.
>
> In fact, in some ways for them, living with it, it may almost be worse.  Because Mr. Chansler didn't . . . hold them down or put a gun to them or do the things himself, he made them do these acts to themselves.

Case No. 3:10-CR-100, DE205:137.  Similarly, the defendants in *Ables*, *Whitt*, and *Harris* received 80-, 60-, and 50-year sentences, respectively, without physical contact with their victims.  These decisions are consistent with the academic literature documenting the fact that—even without direct physical contact—sextortion causes similar harms and poses similar risks as other forms of child sex abuse, including the substantial, tragic risk of victim suicide.

Sixth, Killen's relatively young age for an adult offender does not distinguish his case from other sextortion cases.  Nor did other defendants' young age justify a large downward variance, much less the statutory minimum sentence, in comparable cases.  As noted above, the defendant in *Chansler* committed his offense conduct in his mid-20s, and the defendant in *Dickerson* also appears to have started committing child pornography-related offenses in his mid-20s before being prosecuted as a 33-year-old.  Both received sentences of over 100 years.  Similarly, the defendant in *United States v. Lucas Robinson*, Case No. CR-12-89 (N.D. Iowa), committed his offenses between the ages of 20 and 23.  Case No. CR-12-89, DE62:16.  The district court refused his request for a downward variance to the mandatory minimum and instead sentenced him to his advisory Guidelines sentence, which was also his maximum sentence, of 42 years.  The defendant in *United States v. Trevor Shea*, Case No. 10-CR-96 (S.D. Ind.), received a 33-year sentence despite being 19 to 20 at the time of his offense conduct, and the government requested that reduced sentence pursuant to USSG § 5K1.1 because he provided substantial assistance.

32

Numerous other defendants were in their early 20s, with even more ranging from their 20s to their 30s. The reality is that, because sextortion requires relatively sophisticated understanding and manipulation of social media technology and the Internet, many of the perpetrators of these offenses will be relatively youthful. Thus, age does not distinguish Killen in any way.

Killen's sentencing memorandum cites only a handful of cases in its discussion of disparity, including the easily distinguishable *United States v. Brandon Royce Phillips*, Case No. 17-CR-29. That case featured a much smaller number of identified victims (4), and Phillips received only a small, 13-percent downward variance from his advisory Guidelines range of 235-293 months. The fact that a defendant with a much lower advisory range and fewer victims received a lower sentence (and, even then, will serve more than the mandatory minimum 15 years that Killen has requested) has little to no relevance here. The other examples identified by Killen, like *Kapordelis*, do not even concern sextortion. *Kapordelis* also is not a particularly useful analog because the advisory Guidelines range in that case was so much lower. *See* 569 F.3d at 1303 (noting that Kapordelis's advisory Guidelines range was 262 to 327 months). Moreover, the hands-on physical abuse and other aggravating circumstances justified "a variance above [Kapordelis's] guideline range" in that case. 729 F. App'x at 717. Here, in contrast, the government seeks a sentence within the Guidelines. Comparing apples to oranges would be more useful than basing the final sentence in this case on an example where the advisory Guidelines range was approximately 10 percent of Killen's advisory Guidelines sentence.

The cases identified in Exhibit 2 are the most comparable cases to the offense conduct here. While no case features all of the aggravating circumstances present here, the government submits that the *Dickerson* (110 years), *Chansler* (105 years), and *Ables* (80 years) prosecutions represent

33

the closest analogs to Killen's circumstances.  Thus, this Court would not create any unwarranted

disparity by pronouncing a similarly severe sentence in this case.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the Defendant to a term of imprisonment of 274 years.

Respectfully submitted,

Benjamin G. Greenberg
United States Attorney

By: s/Robert Emery
ROBERT EMERY
Assistant United States Attorney
Court ID No. A5501892
99 Northeast 4th Street
Miami, Florida 33132-2111
Telephone: 305-961-9421
Email: Robert.emery2@usdoj.gov

By: s/Jason Wu
JASON WU
Assistant United States Attorney
Court ID No. A5502299
99 N.E. 4th Street
Miami, FL 33132
Telephone: (305) 961-9226
Email: Jason.Wu@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was uploaded onto

the Court's CM/ECF system this 21st day of August, 2018, and that counsel for the Defendant

received a true and correct copy via that manner.

s/ Jason Wu
Assistant United States Attorney