UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20106-CR-SCOLA

FILED by [signature] D.C.
AUG 2 4 2018
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - MIAMI

UNITED STATES OF AMERICA,

versus

PATRICK KILLEN, JR.
a.k.a. rebeccatill05,
a.k.a. beverlyhills05,
a.k.a. chanelizzabel,

**Appellant, PATRICK KILLEN, JR.'S Notice of Filing**

COMES now the Pro Se Appellant, PATRICK KILLEN, JR. and hereby gives notice of filing Affidavit of Karen L. Killen, in support of the previous filing of Appellant, Patrick Killen, Jr.'s Notice of Supplemental Authority

Respectfully submitted this 22nd day of August, 2018.

*/s/ Patrick Killen, Jr.*
Patrick Killen, Jr.
Pro Se

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served via U.S. Postal Mail on August 22, 2018, on all counsel or parties of record on the Service List below.

By: *<u>/s/ Patrick Killen, Jr.</u>*

Patrick Killen, Jr.
Pro Se

Bernardo Lopez, Esq.
Assistant Federal Public Defender
One East Broward Boulevard
Suite 1100
Fort Lauderdale, FL 33301

Katie Carmon, Esq.
Assistant Federal Public Defender
150 West Flagler Street
Suite 1500
Miami, FL 33130

Robert Emery, Esq.
Assistant United States Attorney
99 NE 4th Street
Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20106-CR-SCOLA

UNITED STATES OF AMERICA,

versus

PATRICK KILLEN, JR.
a.k.a. rebeccatill05,
a.k.a. beverlyhills05,
a.k.a. chanelizzabel,

**AFFIDAVIT of Karen L. Killen**

COMES NOW, the Affiant, KAREN L. KILLEN, after having been first duly sworn, under oath, and states as follows:

1. I currently reside at 6880 Pinehurst Drive, Miami, FL 33015 and am a resident of the State of Florida.
2. I am the 62-year old mother of Appellant, Patrick J. Killen, Jr.
3. I hold a PhD from a regionally accredited university and am currently employed as a Business Department Chair.
4. I suffer no legal disabilities and have personal knowledge of the facts herein.
5. On February 11, 2014 the Appellant, Patrick Killen, Jr. was 20 years old.
6. On February 11, 2014 the Appellant, Patrick Killen, Jr. was in the Culinary Arts Management program Miami Dade College.
7. I was present on February 11, 2014 when two FBI agents, Special Agent Laura Schwartzenberger and Special Agent Jason Ginther, knocked on our door around 7:00 am (Exhibit A – Direct Schwartzenberger, lines 12 - 13).

8. After I opened the door, Special Agent Laura Schwartzenberger stated she was with the FBI and asked to speak with my son, Patrick Killen, Jr. (Exhibit B – Direct Schwartzenberger, line 24).

9. I told both FBI agents that I had surgery scheduled for later that morning and now would not be a good time.

10. I had emergency surgery scheduled for later that morning due to complications with my bi-lateral mastectomy that was performed a few weeks earlier (Exhibit C).

11. Special Agent Laura Schwartzenberger stated it "would only take a few minutes."

12. I asked both FBI agents why they needed to speak with my son, Patrick Killen, Jr.

13. Special Agent Laura Schwartzenberger stated they were following up on an Internet lead out of North Carolina and only needed to ask a few questions (Exhibit D – Direct Schwartzenberger, lines 23 - 24).

14. At no point did Special Agent Laura Schwartzenberger state that she was going to interrogate my son, Patrick Killen, Jr.

15. I told Special Agent Laura Schwartzenberger and Special Agent Jason Ginther they could sit at the dining room table only (Exhibit E – Direct Schwartzenberger, lines 14 - 16).

16. Patrick Killen, Sr. and I walked to the Appellant's bedroom and woke up the Appellant, Patrick Killen, Jr.

17. The Appellant, Patrick Killen, Jr., barely awake, and still wearing his pajamas, walked to the dining room to speak with the two FBI agents (Exhibit F – Direct Schwartzenberger, lines 23 - 25).

18. Special Agent Laura Schwartzenberger demanded to see Appellant's electronic equipment.

19. At this point, neither Special Agent Laura Schwartzenberger nor Special Agent Jason Ginther knew what electronic devices the Appellant owned so no verbal consent to search was given and no Consent to Search Computer(s) was signed.
20. Because the Appellant was still only wearing his pajamas, he was cold and asked to go to his bedroom to retrieve his robe (Exhibit G – Direct Schwartzenberger, lines 11 - 13).
21. I again asked what the visit was about.
22. Special Agent Laura Schwartzenberger again stated they were "following up on a lead out of North Carolina" (Exhibit D – Direct Schwartzenberger, lines 23 - 24).
23. I again stated I had surgery scheduled for later that morning, but both Special Agent Laura Schwartzenberger and Special Agent Jason Ginther neglected, failed and refused to leave my home.
24. The Appellant went to his room to obtain his iPhone and MacBook Pro only. (Exhibit H – Direct Schwartzenberger, lines 23 - 24).
25. The Appellant did not give verbal consent to search his electronic equipment, nor did Appellant sign a Consent to Search Computer(s), nor did Appellant sign any document allowing the search of his electronic equipment.
26. Under the color of the law, Appellant reluctantly gave the password to the MacBook Pro.
27. Neither Special Agent Jason Ginther, nor Special Agent Laura Schwartzenberger produced a search warrant (Exhibit I – Direct Schwartzenberger, lines 23 - 24).
28. Special Agent Jason Ginther searched the electronic equipment without verbal consent nor written consent from the Appellant or any other adult in the home.
29. Appellant went to his bedroom to retrieve his iPhone that was charging.

30. When nothing was found on the iPhone, Special Agent Laura Schwartzenberger asked the Appellant if he had other phones.

31. Special Agent Jason Ginther followed Appellant to Appellant's bedroom to look for another mobile phone.

32. Neither the Appellant nor any other adult in the home gave verbal consent or written consent that allowed Special Agent Jason Ginther to follow the Appellant to Appellant's bedroom.

33. Neither Special Agent Laura Schwartzenberger nor Special Agent Jason Ginther produced a search warrant (Exhibit I – Direct Schwartzenberger, lines 23 - 24).

34. After approximately one (1) hour, Special Agent Laura Schwartzenberger took the Appellant outside to the back patio in the backyard.

35. I again told Special Agent Jason Ginther that I had surgery scheduled for later that morning, but both Special Agent Jason Ginther and Special Agent Laura Schwartzenberger neglected, failed and refused to leave my home.

36. I attempted to follow Special Agent Laura Schwartzenberger and my son, Patrick Killen, Jr. outside.

37. Special Agent Jason Ginther stood between me and the sliding glass door, blocking my exit.

38. I asked Special Agent Jason Ginther why I was not being allowed to exit my home to be with my son.

39. Special Agent Jason Ginther stated "you can't go out there he is over 18 years old" (Exhibit J- Direct Ginther, lines 20 - 22).

40. Because I was not allowed to leave my home to be with my son, I stood off to the side of the sliding glass door and began to frantically wave my hands and arms, hoping that my son would see me waving.

41. Special Agent Jason Ginther stood beside me smiling.

42. Because I was not allowed to be with my son, Patrick Killen, Jr., it was my understanding that he was being held in custody.

43. Because I was not allowed to be with my son, Patrick Killen, Jr. it was my understanding that I was being held in custody.

44. Special Agent Jason Ginther was unable to search the iPhone using the Cellbright equipment (Exhibit K – Direct Ginther, lines 20 -23).

45. Special Agent Jason Ginther found nothing illegal on the MacBook Pro using the IOS Triage equipment.  The only item Special Agent Jason Ginther found on the MacBook Pro was a filing sharing program called Gigatribe (Exhibit L – Direct Ginther, lines 1 - 6).

46. After returning from the back patio, Special Agent Laura Schwartzenberger asked Appellant if there were any other electronic devices (Exhibit M – Direct Ginther, lines 11 - 20.

47. After returning from the back patio, two thumb drives were brought out to the dining room (Exhibit M – Direct Ginther, lines 11 – 20).

48. Special Agent Jason Ginther went back to Appellant's bedroom to search for more electronic devices (Exhibit N – Direct Schwartzenberger, lines 10 - 13).

49. Neither the Appellant, nor any adult in the home gave verbal consent nor written consent for Special Agent Jason Ginther to go back into the Appellant's bedroom.

50. Neither Special Agent Jason Ginther nor Special Agent Laura Schwartzenberger produced a search warrant (Exhibit I – Direct Schwartzenberger, lines 23 – 24).

51. In my presence, I saw Special Agent Jason Ginther manually search the MacBook Pro without verbal consent and without a Consent to Search Computer(s).

52. In my presence, I saw Special Agent Jason Ginther search the iPhone without verbal consent and without a Consent to Search Computer(s).

53. Special Agent Laura Schwartzenberger stated she needed to take the electronic equipment.

54. I asked Special Agent Laura Schwartzenberger, "Don't you need a search warrant for that?"

55. Special Agent Laura Schwartzenberger then stated "It is better to voluntarily relinquish the items because we wouldn't want SWAT to knock down your door especially since you are in such a nice neighborhood, you would not want your neighbors to know."

56. I was so upset with the threat of Special Agent Laura Schwartzenberger, that on Frimorning, February 21, 2014, 10 days after the incident, I sent an email to our attorney, Richard Salzman, Esq. reiterating and memorializing the threat. (Exhibit O).

57. At the time of sending the email to our attorney, Richard Salzman, Esq., I had no idea the Appellant, Patrick Killen, Jr. would be arrested more than 12 months later on March 6, 2015 (Exhibit P).

58. After threatening us with SWAT, the two FBI agents, Special Agent Jason Ginther and Special Agent Laura Schwartzenberger demanded the Appellant, Patrick Killen, Jr. sign the Consent to Search Computer(s) (Exhibit Q).

59. Because of the demand being made by Special Agent Laura Schwartzenberger and Special Agent Jason Ginther and the threat of SWAT and breaking down our door, the Appellant was coerced into signing the Consent to Search Computer(s) just prior to the two FBI agents departing our home (Exhibit Q).

60. At no time in my presence did Special Agent Laura Schwartzenberger or Special Agent Jason Ginther ask the Appellant, Patrick Killen, Jr. to sign a Consent to Search

Computer(s) or any document giving consent to search electronic equipment at the beginning of the knock and talk.

61. Had the Consent to Search Computer(s) been signed by Appellant at the beginning of the of the knock and talk, Special Agent Laura Schwartzenberger would have initialed the two (2) thumb drives that were added to the Consent to Search Computer(s) just prior to their departure (Exhibit Q – Direct Schwartzenberger, lines 1 - 4).

62. There are no initials adding the two (2) thumb drives on the Consent to Search Computer(s) (Exhibit R).

63. I made multiple requests to Appellant's defense attorney to be allowed to file complaints against Special Agent Laura Schwartzenberger and Special Agent Jason Ginther, for the custodial interrogation and verbal threat, but Fred Schwartz, Esq. would not allow me to file a complaint until after the Evidentiary Hearing on May 29, 2015 (Exhibit S).

64. The Appellant was advised that he was not going to be arrested that morning (Exhibit T – Direct Schwartzenberger, lines 22 - 25).

65. As an adult, when Special Agent Jason Ginther refused to allow me to go into the backyard to be with my son, Patrick Killen, Jr., I felt intimidated by the two FBI agents and was afraid to demand they leave my home even though I had emergency surgery scheduled for later that morning, February 11, 2014.

66. After being told multiple times that I had surgery scheduled for later that morning, both Special Agent Laura Schwartzenberger and Special Agent Jason Ginther neglected, failed and refused to leave my home.

67. At no time in my presence, did the Appellant sign the Consent to Search Computer(s) prior to electronic equipment being searched.

68. At no time in my presence, did the Appellant or any adult in the household give Special Agent Laura Schwartzenberger or Special Agent Jason Ginther verbal or written consent to search electronic equipment.

69. At no time in my presence, did the Appellant or any adult in the household give Special Agent Laura Schwartzenberger or Special Agent Jason Ginther verbal or written consent to search our home.

70. At no time in my presence, did the Appellant or any adult in the household give Special Agent Laura Schwartzenberger or Special Agent Jason Ginther permission to go to the back patio in the backyard.

71. At no time in my presence, did the Appellant or any adult in the household give Special Agent Laura Schwartzenberger or Special Agent Jason Ginther permission to go into Appellant's bedroom.

72. At no time in my presence, was the Appellant given the *Miranda* warning prior to being interrogated while being alone and while being held in custody on the back patio in the backyard.

73. At no time in my presence was the Appellant told he was being interrogated for a crime.

74. At no time in my presence did Special Agent Laura Schwartzenberger or Special Agent Jason Ginther request permission to search my home.

75. At no time in my presence did Special Agent Laura Schwartzenberger or Special Agent Jason Ginther produce a search warrant.


FURTHER AFFIANT SAYETH NAUGHT.

Karen L. Killen 7/30/18
Date

**NOTARY ACKNOWLEDGEMENT**

STATE OF FLORIDA

COUNTY OF BROWARD, ss:

I declare to the best of my knowledge and belief that the information herein is true, correct and complete.

Executed this 30th day of July, 2018.

Subscribed and sworn to before me, Kenty Jacquet, on 30th day of July, 2018, Karen L. Killen, who is personally known to me or who proved to me on the basis of satisfactory evidence with Florida Driver's License No.: K450512565180, to be the person who appeared before me.

Signature ____________________

Seal ____________________ Expires on: 8/24/2019

Kenty Jacquet
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF912126
Expires 8/24/2019

Is there a particular type of electronic item that Kik is used on?

A. Typically a cell phone. It is a mobile application. The type of people that use Kik use it on a cell phone, or an iPod, or some mobile device, meaning not a desktop computer.

Q. So someone who wants to use Kik, they download the application to their Smart Phone, is that correct?

A. Yes, that's correct.

Q. Now, when you said you made this decision to do a knock and talk video, was that on the morning of 2014?

A. Yes, it was.

Q. Did any other Special Agent go with you?

A. Yes, Special Agent Jason Ginther.

Q. Why was Special Agent Ginther going with you?

A. I worked with Special Agent Ginther on the Crimes Against Children Squad.

Q. What was his role going to be with respect to the knock and talk?

A. His role was going to be to conduct any forensic analysis if permitted.

Q. So on the morning of February 11th, what time did you arrive at the residence?

A. Approximately 7:30 a.m.

Q. Was that a weekday?

A. Yes, it was.

Exhibit A

**MR. SCHWARTZ:** I'm sorry, I didn't hear the time. Forgive me.

**MR. EMERY:** 7:30 a.m. approximately.

BY MR. EMERY:

Q. For the interview, how were you dressed?

A. Business casual.

Q. Were you armed?

A. Yes, we were.

Q. Where was your weapon?

A. Mine was on my holster. Mine was in the holster on the ankle covered up by my pant leg. Special Agent Ginther has his firearm on his side covered up by his shirt.

Q. When you arrived at the residence, were you in a marked or unmarked vehicle?

A. Unmarked.

Q. When you arrived at the residence -- do you recall exactly the address of the residence?

A. I believe it's 66880 Pinehurst Drive, Hialeah.

Q. What did you do when you arrived at the residence?

A. We knocked on the door. Either Patrick Killen or Karen Killen, which is the defendant's mother, came to the residence. I don't recall which one. We identified ourselves as special agents with the FBI, stated our names, showed our credentials. We requested to speak with Patrick Killen, Junior.

Q. Why did you want to speak with Patrick Killen, Junior?

| PREMED ☑ By Anesthesia | ANESTHETIC TECHNIQUE | PLACED BY ANESTHESIA | PRE-INDUCTION REVIEW | I.V. ANTIBIOTICS |
|---|---|---|---|---|
| Drug: Versed | ☑ General ☐ MAC | ☐ A-Line ☐ CVP | ☑ Pt. Identified | Drug: Cleocin |
| Dosage: 2mg IV | ☐ Regional: | ☐ PA Line ☐ IV | ☑ Chart Reviewed | Dosage: 600 mg |
| Time: 1726 | ☐ Post-op Pain relief: | ☐ Other: | ☑ Consent Signed | Time: 1742 |
| | ☐ Spinal | | ☑ NPO | |
| | ☐ Epidural: TH / L | | ☑ ASA Class: 2 | |
| | ☐ Other: | | ☑ Anesthesia Equip. Checked | |

TIME: 1730 · 1800 · · 1830

DRUGS: $O_2$ L/min; ☑ $N_2O$ ☐ AIR; Sevo %; Lido (mg) 30; Propofol (mg) 190; Succinylcholine 60; Fentanyl 25 25 25 25

MONITORS: ☑ B/P ☑ ECG ☐ Pulse Oximeter ☑ ETCO ☐ $O_2$ Analyzer ☑ Temp. ☐ Nerve Stimulator ☐ A-Line ☐ CVP ☐ Swan-ganz Catheter

1728 Pt accompanied to OR 9 [illegible] ... Preox 100% [illegible] ... Smooth IV induction ... ETT placed atraumatic, cuff ... +ETCO2 +BBS = Eye tape ... Supine on warming blanket 43°C ... [illegible]

Spontaneous [illegible] ... [illegible] extubated [illegible] complication ... 100% O2 ... VSS. → PACU ... Report given to RN.

Pre induction VS — Time: 1732; BP: 140/71; HR: 69; RR: 14; $O_2$Sat: 100

MBP → RLE

KEY: B/P: V Λ; P: •; SV: Spontaneous Ventilation; CV: Controlled Ventilation

VENTILATION / EVENT / ECG: SR SR SR SR SR SR; $SaO_2$: 99 99 99 100 100 100; $FIO_2$; $ETCO_2$; TEMP; POSITION: Supine — Supine — Supine

I/O: UO; EBL; U/O: Ø Foley; 800

Diagnosis: Breast CA, Open Wound Left Breast

Anesthesia Pause: 1725

Anesthesia Start: 1728

Operation: Left Breast Debridement Open Wound & Local Tissue Rearrangement

Anesthesia end time (sign off): 1858

Surgery Start: 1805 Surgery Stop: 1845

Name of Surgeon(s): GOTTENGER

Anesthesiologist (print name) Signature Date

CRNA (print name) Signature Date

SOUTH MIAMI HOSPITAL

**ANESTHESIA RECORD**

☐ Outpatient/OPO ☐ Inpatient

Card #: 202116

Designation: White - Chart Canary - Anesthesia

SMH 109 Rev. 11/10 02600S0109

KILLEN, KAREN
529729972 02/11/14
1361317 F 58 01/18/56 OP
GOTTENGER, RAFAEL D OPS

EXHIBIT C

Q. Did you say anything else to her?

A. Yes. At one point, I said we are trying to be low-key. Sometimes during these types of investigations, we use squads and the whole neighborhood knows about it. However, now we are trying to be low-key. We don't need your neighbors knowing why we are here or what's going on.

She later said "Oh, just give them what they want. Whatever they want."

Q. Who was she talking to at that point?

A. I believe she was talking to Patrick Killen, Junior.

Q. While you were having this conversation with the mother, how was the conversation going?

A. It was a regular conversational tone. There was no raising voices or yelling.

Q. While you are speaking with the mother, where was the father at this point?

A. The father at some point had left the residence with Aylissa Killen. Eventually he did come back. I believe it was during the time when we were searching -- actually when Special Agent Ginther was looking through the laptop and he said "okay, you guys have been here for a while. I need to know what this is about."

I reiterated that we are pursuing a lead out of North Carolina and a lead on the Internet.

Q. I want to go back to the conversation with the mother.

EXHIBIT D

Q. You and Special Agent Ginther go inside, correct?
A. Correct.
Q. What happens next?
A. We are directed to sit down at the dining room table. That's not very far from the entrance to the residence. I sit next to Patrick Killen, Junior and Jason sits across from Patrick Killen, Junior.
Q. Do you know approximately how many square feet was the residence?
A. If I had to guess, I would say maybe 2,000, 2500.
Q. How many feet was it approximately from the front door to the dining room you sat down at?
A. 25 to 30 feet I would say approximately.
Q. You said that you were directed to sit down at the dining room table?
A. Yes. I don't remember who -- I think it was Patrick Killen Junior that had motioned for us to sit there.
Q. Who was seated at the dining room table?
A. It was Patrick Killen Junior, myself and Special Agent Ginther.
Q. Then, for the record, can you identify for the record the person just spoke about as far as Patrick Killen, Junior?
A. Yes, this gentleman here.

**MR. EMERY:** May the record reflect that the agent has identified the defendant, Your Honor.

EXHIBIT E

was at that time 13 or 14?

A. I knew from my checks of residence that there didn't appear to be anybody with the name Rebecca Til living at the residence or related.

I know from my training and experience that the subjects in child pornography investigations are typically male.

Q. So because, in your experience, it's typically a man not a woman, even though it was a girl's name not a boys' name, you focused on Patrick Junior instead of his sister?

A. We asked to speak to Patrick Killen. I don't think it would be correct to say "focused on" because initially in the interview, we are trying to determine if we are speaking to the right person because the IP address just comes back to the house.

Q. But the name was a female name?

A. Yes, I would say rebeccatil05 is a female name and posing as a female.

Q. You said that Patrick appeared to be shaking and cold, is that right? Well, appeared to be shaking. You didn't say he was cold.

A. Yes, we asked him if he was cold. He was shaking.

Q. He was at that time wearing a light T-Shirt and pajamas pants. Is that right?

A. That was correct.

EXHIBIT F

table. I'm guessing it was probably 15 feet. It was in between the entrance to the residence and the dining room table.

Q. Was Karen Killen able to view you at the dining room table?

A. Yes, she could clearly see us and I'm guessing she could hear conversational speech from that point but probably not a whisper.

Q. All right so you and Special Agent Ginther are at the dining room table. The defendant comes to sit down. Did you notice anything physically about the defendant?

A. Yes, we noticed that he was shaking. We asked him if he was cold. He said yes and he got up to retrieve a large robe and sat back down. He left alone to retrieve the robe.

Q. You didn't escort him to retrieve the robe?

A. No, we did not.

Q. Did he ask permission to go get robe?

A. I do not recall. I just remember we asked if he was cold. I don't know if he asked permission to step aside. But we weren't trying to control his or anybody else's moves in the house.

Q. Was it cold in the house?

A. I didn't think it was, no.

Q. Prior to February 11, 2014, had you ever met the defendant before?

A. No, I had not.

EXHIBIT G

THE COURT: Okay.

BY MR. EMERY:

Q. You just heard what Mr. Schwartz said, right?

A. Yes.

Q. If you forget, I will remind you.

Did you also ask him about the service provider?

A. Yes, I asked him and he said it was AT&T. I asked him if it was secured wireless. He said yes. I asked him if it was always secured. He said yes. He provided the password as well.

Q. Why did you ask the question about the Internet server was secured or not?

A. Because for our investigations, meaning investigations of the FBI, that helps us narrow down as far as the IP address being used by somebody in the residence or by somebody who has the password. If wireless is unsecure, a neighbor could possibly be using a WiFi network or somebody parked outside of the residence could be using it.

However, if it's secured, you would have to have the password to be able to use the WiFi network.

Q. After asking him these questions, did you ask him if he had any Internet items?

A. Yes, he stated that he had an Apple Macbook Pro. And an Apple Five that he used. I asked if other members of the house had electronic devices. He said they all had their own

EXHIBIT H

to say that, the rebeccati105 user the IP address is originating from the house in Hialeah?
A. Yes.
Q. Once that is determined, what did FBI Charlotte do next?
A. They sent a lead to the Miami division to conduct investigation deemed appropriate.
Q. Were you assigned to follow up on that lead?
A. Yes, I was.
Q. What did you decide to do?
A. We initially -- I initially drove by the house a couple of times to determine if the Internet was secured. It was secured.
I spoke with the U.S. Attorney's Office to determine the best course of action, because the MLAT process takes a while, it was determined that there could be a possible staleness issue in the matter. So in consultation with the U.S. Attorneys Office, we determined that a knock and talk has been the best course of action to start with in this matter.
Q. When you say "knock and talk", briefly what do you mean by that?
A. Just knock on the residence and ask to speak with the person, inhabitants, of the residence.
Q. You are not going with the search warrant, correct?
A. Correct.
Q. I just want to go briefly to what we talked about, Kik.

EXHIBIT I

Q. After the defendant just admitted to being rebeccati105, did you go back inside the house?

A. Yes, their interview was complete so we went back in.

Q. Let me just step back for a second. Before you went out to the patio and while you were in there reviewing the Macbook Pro and the other electronic items, did the mother say anything to you?

A. Yes, she was inquisitive about what I was actually doing with the cell phone. She asked about that. I explained to her the process what I explained just earlier to copy information so we don't have to take it. I even told her that I believe it wasn't working well for me.

Q. Did she ever ask any questions about what was going on outside?

A. You could see them talking out there. She made a statement of maybe I should go out there to be with my son.

Q. What did you respond?

A. I explained to her that he asked Special Agent Schwartzenberger that he wanted to speak to her alone away from the parents. He was an adult. We generally like to do our interviews in private so he doesn't feel outside influences when he talks to us. That was it.

I was sitting at the table again at that same time trying to examine all of these things and just trying to answer a question for her.

EXHIBIT J

did.

Also, Special Agent Schwartzenberger had already built a rapport with Patrick Killen, Junior. He felt comfortable enough to talk to her and say that he wanted to talk to her without his parents being around. So you can hinder the investigation at that point. There was a glass window or something there. So I could still see her in the back yard with her. Officer safety wise I felt comfortable with it.

Q. You were able to see them outside?

A. Yes.

Q. Where did they go outside?

A. There was a little table out there. A patio. She was sitting on one side and he was sitting on the other.

Q. I know you weren't out there, but could you at least -- did it look like they were speaking?

A. Yeah, just like somebody having a Sunday brunch out there. Nothing awkward about it.

Q. So you were inside reviewing the Macbook Pro and the iPhone.

Were you able to do a complete review, were you able to review the iPhone?

A. No, I continually got error messages on the Cellebrite machine. It wasn't properly doing something. I tried several times to do it and it's not that lengthy a process, but it is time consuming. I kept getting error messages.

Exhibit K

Q. What about with respect to the Macbook Pro, did you find anything on that computer?

A. Yes, during the time I am multi-tasking, trying to perform the Cellebrite, looking at the iPad, trying to do a basic search, on the Macbook Pro, one thing I saw was a file sharing program on there that looked like Gigatribe.

Q. Is that a file sharing program?

A. Yes.

Q. Why is that a concern to you?

A. It has legitimate uses and child pornographers are known to use that program to trade and share child pornography files.

Q. Did there come a time when you came out to the patio?

A. Yes, I wrapped up the unsuccessful Cellebrite and I went outside to see how they were doing outside.

Q. Once you got outside, what happened next?

A. Special Agent Schwartzenberger informed me they were pretty much finished. She surmised generally what Patrick Killen, Junior told her in his presence to me that he was using Kik and he was rebeccatil05, and he was exploiting young boys and he was probably bi-sexual. Just a quick assumption. She asked -- Special Agent Schwartzenberger asked Patrick Killen, Junior if that was accurate in my presence and he said yes, it was.

Q. You said she was summarizing this, what was she looking at?

A. She was looking at her note pad which was right on the table in front of her.

EXHIBIT L

Q. Did you ever physically touch the mother?
A. Absolutely not.
Q. At any time you were in the house, did you ever physically touch the mother?
A. Absolutely not.
Q. Did you ever physically touch the father?
A. No.
Q. Did you ever physically touch the defendant?
A. No.
Q. Let's fast forward again.
You said you go inside after being on the patio. What happens next?
A. Special Agent Schwartzenberger asked if there are any other electronic devices that Patrick Killen, Junior owned himself.
Q. What was his response?
A. He explained that he had a couple of thumb drives.
Q. After informing you that he had two thumb drives, what did the informant do next?
A. He went and retrieved the thumb drives and brought them to us.
Q. Did he go alone or was he accompanied?
A. Alone.
Q. After he brought you the thumb drives, what, if anything, did Special Agent Schwartz do with those thumb drives?
A. She documented them on the consent to search computer form

EXHIBIT M

It even appeared that he almost wanted to come with us because he was afraid of his parents being mad at him, or them kicking him out of the house, or him not having a place to stay.

Q. The fact that he asked you a number of times whether he was going to be arrested that day, did that indicate to you that he was concerned that he was going to be arrested talking to you?

A. I don't recall him asking if he was going to be arrested at all. I just told him.

Q. Is it your testimony that Agent Ginther was in Patrick's room was just before you left when he went in there and searched for the Galaxy 5?

A. Yes, that is correct. During the knock and talk, yes.

Q. Weren't you aware very earlier in your conversation with Patrick that he used a Galaxy 5 during the period of time that the North Carolina victim was being victimized?

A. I'm sorry, can you repeat the question?

Q. Forgive me for being inarticulate. I really am.

When, in fact, did the incidents in North Carolina occur?

A. I believe it was November 2012 to the best of my recollection.

Q. You were there -- at the time you were initially there, this wasn't your case, was it?

A. That's correct.

EXHIBIT N

**Karen Killen**

**From:** Richard Salzman [richard@salzmanattorney.com]
**Sent:** Friday, February 21, 2014 5:36 PM
**To:** Karen Killen
**Subject:** RE: It's Richard. Quick question...
**Follow Up Flag:** Follow up
**Flag Status:** Red

**Its NOT voluntary when they threaten you like that!**

It doesn't make sense why they did not get a proper Search Warrant. It would have taken them 30 minutes to obtain one. Something is completely out of whack.

**Richard G. Salzman, Esq.***
Law Offices of Richard G. Salzman, P.A.
4340 Sheridan Street, Suite 102
Hollywood, FL 33021
Tel.: (954) 981-0336
Fax: (954) 981-0337
richard@salzmanattorney.com
www.salzmanattorney.com
** Licensed to practice in FL, NY and NJ*
**Federally admitted in FL (SDFL, MDFL), NY (EDNY, SDNY) and NJ*
**Admitted to practice in U.S. Tax Court*

PRIVILEGE AND CONFIDENTIALITY NOTICE: This e-mail is protected from disclosure by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2512. It may contain privileged and confidential information that is protected from disclosure. If you received this e-mail by mistake, please contact the sender at Richard@salzmanattorney.com or (954) 981-0336, and delete it. If you intercepted or received this e-mail without my authorization, please delete it. This communication does not create an attorney-client relationship, nor does it constitute legal advice. Anything in this e-mail that discusses settlement or compromise negotiation is protected from subsequent use by FRE 408 and FS 90-408, and FRE 410 and FS 90-410. Receipt of this communication does not waive attorney-work product, a client's privilege or any other privilege because of misdelivered email. Thank you.

**From:** Karen Killen [mailto:killenkaren@gmail.com]
**Sent:** Friday, February 21, 2014 5:23 PM
**To:** Patrick Killen
**Cc:** Richard Salzman; patrickjkillen@gmail.com
**Subject:** Re: It's Richard. Quick question...

The two FBI agents also threatened us when we asked if they had a search warrant stating that it is better to voluntarily relinquish the items because we wouldn't want SWAT to knock down our door especially since we are in such a nice neighborhood we wouldn't want our neighbors to know.

Sent from my iPhone

On Feb 21, 2014, at 4:48 PM, Patrick Killen <patrick@patrickkillen.com> wrote:

> Richard,
>
> Thanks,

EXHIBIT O

Case 1:15-cr-20106-KMM Document 34 Entered on FLSD Docket 05/11/2015 Page 1 of 2

AO 442 (Rev 01/09) Arrest Warrant

FBI 974575 3

FILED by MM D.C.
MAY 1 1 2015
STEVEN M LARIMORE
CLERK U S DIST. CT.
S D of FLA MIAMI

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America
v.
Patrick Killen, Jr.,
*Defendant.*

Case No. **15-20106**

**CR-MOORE** / McALILEY

## ARREST WARRANT

To: Any authorized law enforcement officer

~~SEALED INDICTMENT~~

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay *(name of person to be arrested)* Patrick Killen, Jr. who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☐ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

Production of Child Pornography, in violation of Title 18, United States Code, Sections 2251(a) and (e);
Distribution and Receipt of Child Pornography, in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1);
Interstate Threats, in violation of Title 18, United States Code, Section 875(d);
Possession of Child Pornography, in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and (b)(2); and
Destruction of Records of a Federal Investigation, in violation of Title 18, United States Code, Section 1519.

Date: 02/27/2015

RECEIVED MAR 2015 S/FL

*Issuing officer's signature*

City and state: Miami, FL

Steven M. Larimore, Clerk of Court / Court Administrator
*Printed name and title*

**Return**

This warrant was received on *(date)* 03-02-15, and the person was arrested on *(date)* 03-06-15 at *(city and state)* Hialeah, FL by FBI

Date: 03-09-15

BY: JOE GODSK, SDUSM, SD/FL
*Arresting officer's signature*

AMOS ROJAS JR., U.S. MARSHAL, SD/FL
*Printed name and title*

EXHIBIT P

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NUMBER:** ______________________

**BOND RECOMMENDATION**

DEFENDANT: Patrick Killen, Jr.

Pre-trial detention
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: [signature]
AUSA: Robert J. Emery

Last Known Address: ________

________

________

What Facility: ________

________

Agent(s): Laura Schwartzenberger, FBI
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) (**OTHER**)

A. The only part of this form that was done, it was shortly before we left was when Patrick Killen, Junior brought out the thumb drives. We had added the thumb drives to the form and showed him the form again to take a look at the form.

The other items, the Apple Macbook Pro, the iPhone 5 and the iPad 2 were put on the form. He dated it and I signed it prior to doing any searches of those items. That was early on in the interview prior to us going outside to the back patio.

Q. Where on the phone do you note the time it was signed?

A. There is no place to note a time.

Q. There is nothing on the form showing that it was signed by Patrick?

A. That is correct, yes.

Q. Okay. There is nothing in your 302 that says Patrick told me his iPhone was white; is that correct?

A. I don't recall anything like that being in my 302.

Q. Would you like to look at the 302 so that you're sure?

A. I can, to be absolutely sure, yes.

**MR. SCHWARTZ:** Your Honor, I have marked the FBI agent's form 302 as Defendant's Exhibit 1. I would ask to be able to approach the witness to show it to her.

**THE COURT:** Go right ahead.

**THE WITNESS:** I don't see anywhere in here that I list the colors of any of the electronic devices.

EXHIBIT Q

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, Patrick John Killen, Jr., have been asked by Special Agents of the Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers, any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals, described below:

Apple MacBook Air, silver in color; iPhone 5, white in color, iPad 2, white in color,
CPU Make, Model & Serial Number (if available)

Kingston Data Traveler 4GB thumb drive, black in color, Cruzer SanDisk
Storage or Retrieval Media, Computer Peripherals

256 MB thumb drive, black in color

and located at 6880 Pinehurst Dr, Hialeah, Florida, which I own, possess, control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins, and/or specific directions for computer entry are as follows: Password: 5319 (Mac) Password: 5319 (iPhone).

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals.

2/11/14
Date

[signature] Patrick Killen
Signature

02/11/2014
Date

[signature]
Signature of Witness

Laura A. Schwartzenberger
Printed Full Name of Witness

6880 Pinehurst Dr, Hialeah, FL
Location

EXHIBIT R

                                        Karen Killen <killenkaren@gmail.com>

# FW: Killen - Third Response to the Standing Discovery Order

**Fred A. Schwartz** <schwartz@kolawyers.com> Thu, May 28, 2015 at 10:40 PM
To: Karen Killen <killenkaren@gmail.com>

Karen
You can do that now that the testimony is over and the judge won't know of it. Having watched other clients do this, I suggest you will be unhappy with the results
Fred

PLEASE NOTE OUR NEW OFFICE ADDRESS
Fred A. Schwartz
Partner-In-Charge
Boca Raton Office
KOPELOWITZ OSTROW
FERGUSON WEISELBERG
200 East Palmetto Park Road
Suite 103
Boca Raton, FL 33432
Office 561-910-3065
Direct 561-910-3064
Cell. 561-504-8534
Schwartz@kolawyers.com

On May 28, 2015, at 10:35 PM, Karen Killen <killenkaren@gmail.com> wrote:

Fred,

At this point I feel I need to move forward with filing a complaint against Schwartzenberger for failing to obtain a search warrant on 2/11/14 when I asked her for one. Not only did she not obtain a search warrant but she then threatened me. I feel not moving forward will do more damage than any fear of retaliation you may have.

Karen

Karen L. Killen, MBA, PhD (ABD)

6880 Pinehurst Drive

Miami, FL 33015

305-331-8355

killenkaren@gmail.com

EXHIBIT 5

yard. Are you familiar with that?

A. No, I was not. I didn't enter or exit through any gate of the back yard.

Q. When you were taking Patrick out to the back yard, did Mrs. Killen say I want to go with him. I don't want him to go alone?

A. No, she did not.

Q. Were you facing the doors of the house, the sliding glass doors in the back of the house during the course of the interview?

A. On the back patio, I was sitting so I had -- yes, so I was facing the sliding glass doors and Patrick Killen, Junior was sitting so his back was to the sliding back doors.

Q. Did you see the agent attempting to tell her that she couldn't come?

A. No, I did not.

Q. Could you hear what was going on in the house when you were on the back patio?

A. No, I could not.

Q. Did Patrick Killen think he was going to be arrested that day to the best of your knowledge?

A. To the best of my knowledge, no, because I advised him several times both prior to going out to the back patio and while we were out to the back patio that we were not going to take them that day, that he was not under arrest.



ORI
AIL

DELIVERY S

CKING™ INC

CE INCLUDE

VAILABLE

only

NATIONALLY,
LARATION
EQUIRED.

UNITED STATES POSTAL SERVICE®
Click-N-Ship®
usps.com
$6.70
US POSTAGE
Flat Rate Env
9405 5036 9930 0283 6314 19 0067 0000 0013 3128
08/23/2018
Mailed from 33015
062S0000001311
PRIORITY MAIL 1-DAY™
Expected Delivery Date: 08/24/18
KAREN KILLEN
6880 PINEHURST DR
HIALEAH FL 33015-2304
0005
C075
Carrier -- Leave if No Response
SHIP TO:
CLERK OF THE COURT
US DISTRICT COURT SOUTHERN DISTRICT OF
400 N MIAMI AVE
MIAMI FL 33128-1801
USPS TRACKING #
9405 5036 9930 0283 6314 19
Electronic Rate Approved #038555749

00014

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED S
POSTAL S

